Damien Wayne ECHOLS and Charles Jason Baldwin *v.* STATE of Arkansas

CR 94-928 936 S.W.2d 509

Supreme Court of Arkansas
Opinion delivered December 23, 1996

*Val P. Price* and *W. Scott Davidson,* for appellant Damien Wayne Echols.

*Ford & Wadley,* by: *Paul N. Ford* and *George R. Wadley, Jr.,* for appellant Charles Jason Baldwin.

*Winston Bryant,* Att'y Gen., by: *David R. Raupp,* Asst. Att'y Gen., and *Vada Berger,* Asst. Att'y Gen., for appellee.

ROBERT H. DUDLEY, Justice. Damien Echols and Jason Baldwin were convicted of the capital murders of Michael Moore, Christopher Byers, and Steve Branch. For each of the capital murders, appellant Echols was sentenced to death, and appellant

Baldwin was sentenced to life imprisonment without parole. Both appellants appeal from their convictions. Echols separately appeals the death sentences imposed upon him. We affirm in full the judgments of conviction.

Michael, Christopher, and Steve were eight years old, in the second grade, in the same Cub Scout troop, and often played together in their West Memphis neighborhood. On the afternoon of May 5, 1993, after school, Michael and Steve were riding their bicycles while Chris was skateboarding. Deborah O'Tinger saw the three boys walking through her yard between 5:45 and 6:00 that afternoon. Her recollection was that they were pushing a bicycle. At about 6:00 p.m., Dana Moore, Michael's mother, saw the three boys together. At that time Michael was riding his bicycle. Between 6:30 and 6:45 Brian Woody saw four boys going into some woods known as the Robin Hood woods. He noticed that two of the boys were pushing bicycles, one had a skateboard, and a fourth one was just walking behind them. Neither Michael, Christopher, nor Steve returned to their homes. Their parents called the police, and a search was begun.

The next morning, members of the Crittenden County Search and Rescue Unit discovered a tennis shoe floating in a ditch just north of Ten Mile Bayou. The Robin Hood woods drain into Ten Mile Bayou, and the members of the search unit knew the boys were last seen in that area. Detective Mike Allen walked along the ditch bank to the place where the tennis shoe had been found. He noticed that one area of the ditch bank was cleared of leaves, while the rest of the bank was covered with leaves and sticks. He described the cleared area on the bank as being "slick," but having "scuffs" in the cleared-off area. He got into the water, reached down to get the shoe, and felt Michael Moore's body. The corpses of Christopher Byers and Steve Branch were subsequently found about twenty-five feet downstream. Policeman John Moore, who was also there, said there was blood in the water, but none on the bank. Detective Bryn Ridge was also present and helped recover the boys' bodies. He collected the victims' clothes, three tennis shoes, and a Cub Scout cap that was floating in the water. He found a stick stuck in the mud that had one of the boy's shirts wrapped around the end that was stuck down in the mud. He dislodged another stick as he was removing the corpse of Michael Moore.

All three corpses had their right hands tied to their right feet,

and their left hands tied to their left feet. Black shoe laces and white shoe laces were used as ligatures. Michael Moore's body had wounds to the neck, chest, and abdominal regions that appeared to have been caused by a serrated knife. There were abrasions over his scalp that could have been caused by a stick. Dr. Frank Peretti, a State medical examiner, testified that there was bruising and discoloring comparable to that frequently seen in children who are forced to perform oral sex. He testified that there were defensive wounds to the hands and arms. Moore's anal orifice was dilated, and the rectal mucosa was reddened. Dr. Peretti testified this injury could have come from an object being placed in the anus. Finally, Dr. Peretti testified that there was evidence that Moore was still alive when he was in the water, as there was evidence of drowning.

Steve Branch's corpse had head injuries, chest injuries, genital-anal injuries, lower extremity injuries, upper extremity injuries, and back injuries. The body had multiple, irregular, gouging wounds, which indicated that he was moving when he was stabbed. The anus was dilated. Penile injuries indicated that oral sex had been performed on him. There was also evidence that he, too, had drowned.

Christopher Byers's corpse also had injuries indicating that he had been forced to perform oral sex. His head had scratches, abrasions, and a punched-out area on the skin, and one eyelid had a contusion. The back of the neck had a scrape. The inner thighs had diagonal cuts on them. The back of the skull had been struck with a stick-like, broomstick-size, object. The skin of the penis had been removed, and the scrotal sac and testes were missing. There were cuts around the anus, and the hemorrhaging from those cuts indicated he was still alive when they were made. Many of the cuts were made with a serrated blade knife. Byers did not drown; he bled to death.

The boys' bicycles were found nearby.

On May 10, four days after the bodies were found, the police had not solved the cases. When Detective Bryn Ridge questioned Echols, he asked him how he thought the three victims died. Ridge's description of Echols's answer is abstracted as follows:

> He stated that the boys probably died of mutilation, some guy had cut the bodies up, heard that they were in the water, they may have drowned. He said at least one was cut up

more than the others. Purpose of the killing may have been to scare someone. He believed that it was only one person for fear of squealing by another involved.

At the time Echols made the statement, there was no public knowledge that one of the children had been mutilated more severely than the others.

On June 3, or almost one month after the murders, Detective Mike Allen asked Jessie Lloyd Misskelley, Jr., about the murders. Misskelley was not a suspect at the time, but Echols was, and it was thought that Misskelley might give some valuable information about Echols. Detective Allen had been told that all three engaged in cult-like activities. Misskelley made two statements to the detective that implicated Echols and Baldwin, as well as himself. The statements can be found in *Misskelley* v. *State*, 323 Ark. 449, 459-61, 915 S.W.2d 702, 707-08 (1996).

Misskelley, age seventeen, Echols, age nineteen, and Baldwin, age sixteen, were jointly charged with the capital murders of Moore, Byers, and Branch. Misskelley moved for a severance from Echols and Baldwin, and the trial court granted the severance. Misskelley was tried and convicted of first-degree murder in the death of Michael Moore, and second-degree murder in the deaths of Steve Branch and Christopher Byers. The judgments of conviction were affirmed. *Misskelley* v. *State*, 323 Ark. 449, 915 S.W.2d 702 (1996). Appellants Echols and Baldwin were jointly tried in this case. In the guilt-innocence phase of the trial, the jury found both Echols and Baldwin guilty of the capital murders of all three victims. In the penalty phase of the trial, the jury imposed death as the punishment for Echols and fixed life imprisonment without parole as the punishment for Baldwin. The trial court entered judgments of conviction that imposed the sentences set by the jury.

Echols's and Baldwin's arguments together contain forty-four points of appeal, and some of those points have subpoints. Some of the points of appeal are made jointly by both appellants, but many are individual arguments. For clarity, we group the arguments into seven general categories.

### Sufficiency of the Evidence Arguments

■ Echols questions the sufficiency of the evidence to convict him of the three capital murders. In one of his arguments, he

contends that for circumstantial evidence to be sufficient, it must exclude every reasonable hypothesis, and cites as authority *Traylor* v. *State*, 304 Ark. 174, 801 S.W.2d 267 (1990). Before narrating the testimony of his guilt, we again emphasize, as we have often done, that although the jury should be instructed, as it was here, that circumstantial evidence must be consistent with the guilt of the defendant and inconsistent with any other reasonable conclusion, AMI Crim. 106, this is not the standard by which we review the evidence. Our responsibility is to determine whether the verdict is supported by substantial evidence, which means whether the jury could have reached its conclusion without resorting to speculation or conjecture. *Cassell* v. *State*, 273 Ark. 59, 616 S.W.2d 485 (1981). The jury must be convinced of the accused's guilt beyond a reasonable doubt, but we, not having had the advantage of seeing and hearing the witnesses, are guided by the substantial evidence rule. *Cassell*, 273 Ark. at 62, 616 S.W.2d at 486-87.

▉ Moreover, two witnesses testified that they overheard Echols state that he killed the three boys, and this was direct evidence. A confession is sufficient to sustain a conviction if it is accompanied by other proof that the offense was committed by someone. Ark. Code Ann. § 16-89-111 (1987); *Leshe* v. *State*, 304 Ark. 442, 304 S.W.2d 522 (1991).

The substantial evidence of Echols's guilt is as follows. Anthony and Narlene Hollingsworth were well acquainted with Echols and testified that they saw Echols and his girlfriend, Domini Teer, walking after 9:30 on the night of the murders near the Blue Beacon Truck Stop, which is near Robin Hood woods where the bodies were found. The witnesses testified that Echols had on a dark-colored shirt and that his clothes were dirty. This evidence placed Echols in dirty clothes near the scene at a time close to the murders. Although not material to this point, other evidence established that Domini Teer might be confused with Baldwin as both had long hair and were of slight build.

Twelve-year-old Christy VanVickle testified that she heard Echols say he "killed the three boys." Fifteen-year-old Jackie Medford testified that she heard Echols say, "I killed the three little boys and before I turn myself in, I'm going to kill two more, and I already have one of them picked out." The testimony of these two independent witnesses was direct evidence of the statement by Echols. These witnesses were cross-examined by Echols's counsel,

and it was the jury's province to weigh their credibility.

Lisa Sakevicius, a criminalist from the State Crime Laboratory, testified that she compared fibers found on the victim's clothes with clothing found in Echols's home, and the fibers were microscopically similar.

Dr. Frank Peretti, a State Medical Examiner, testified that there were serrated wound patterns on the three victims. On November 17, 1993, a diver found a knife in a lake behind Baldwin's parents' residence. The large knife had a serrated edge and had the words "Special Forces Survival Roman Numeral Two" on the blade. Dr. Peretti testified that many of the wounds on the victims were consistent with, and could have been caused by, that knife.

Deanna Holcomb testified that she had seen Echols carrying a similar knife, except that the one she saw had a compass on the end. James Parker, owner of Parker's Knife Collector Service in Chattanooga, Tennessee, testified that a company distributed this type of knife from 1985-87. A 1987 catalog from the company was shown to the jury, and it had a picture of a knife like the knife found behind Baldwin's residence. The knife in the catalogue had a compass on the end, and it had the words "Special Forces Survival Roman Numeral Two" on the blade. The jury could have made a determination whether the compass had been unscrewed, and, in assessing the probativeness of the location of the knife introduced at trial, heard ample evidence that Echols and Baldwin spent much time together. Therefore, it could have reasonably concluded that Echols or Baldwin disposed of the knife in the lake.

The State's theory of motive was that the killings were done in a satanic ritual. On cross-examination, Echols admitted that he has delved deeply into the occult and was familiar with its practices. Various items were found in his room, including a funeral register upon which he had drawn a pentagram and upside-down crosses and had copied spells. A journal was introduced, and it contained morbid images and references to dead children. Echols testified that he wore a long black trench coat even when it was warm. One witness had seen Echols, Baldwin, and Misskelley together six months before the murders, wearing long black coats and carrying long staffs. Dr. Peretti testified that some of the head wounds to the boys were consistent with the size of the two sticks that were recovered by the police.

Dr. Dale Griffis, an expert in occult killings, testified in the State's case-in-chief that the killings had the "trappings of occultism." He testified that the date of the killings, near a pagan holiday, was significant, as well as the fact that there was a full moon. He stated that young children are often sought for sacrifice because "the younger, the more innocent, the better the life force." He testified that there were three victims, and the number three had significance in occultism. Also, the victims were all eight years old, and eight is a witches' number. He testified that sacrifices are often done near water for a baptism-type rite or just to wash the blood away. The fact that the victims were tied ankle to wrist was significant because this was done to display the genitalia, and the removal of Byers's testicles was significant because testicles are removed for the semen. He stated that the absence of blood at the scene could be significant because cult members store blood for future services in which they would drink the blood or bathe in it. He testified that the "overkill" or multiple cuts could reflect occult overtones. Dr. Griffis testified that there was significance in injuries to the left side of the victims as distinguished from the right side: People who practice occultism will use the midline theory, drawing straight down through the body. The right side is related to those things synonymous with Christianity while the left side is that of the practitioners of the satanic occult. He testified that the clear place on the bank could be consistent with a ceremony. In sum, Dr. Griffis testified that there was significant evidence of satanic ritual killings.

Lisa Sakevicius, the criminalist who testified about the fibers, stated that Byers's white polka-dot shirt had blue wax on it and that the wax was consistent with candle wax.

Detective Bryn Ridge testified that Echols said he understood the victims had been mutilated, with one being cut up more than the others, and that they had drowned. Ridge testified that when Echols made the statement, the fact that Christopher Byers had been mutilated more than the other two victims was not known by the public. The jury could have reasonably concluded that Echols would not have known this fact unless he were involved in some manner.

Echols took the witness stand, and his testimony contained additional evidence of guilt. When asked about his statement that one victim was mutilated more than the others, he said he learned

the fact from newspaper accounts. His attorney showed him the newspaper articles about the murders. On cross-examination, Echols admitted that the articles did not mention one victim being mutilated more than the others, and he admitted that he did not read such a fact in a newspaper.

The foregoing, together, constitutes substantial evidence of the guilt of Damien Echols.

Jason Baldwin does not contend that there was insufficient evidence of his guilt. This is, perhaps, in part, because of the testimony of Michael Carson, who testified that he talked to Baldwin about the murders. Carson's testimony, in pertinent part, was abstracted as follows:

> I said, just between me and you, did you do it. I won't say a word. He said yes and he went into detail about it. It was just me and Jason [Baldwin]. He told me he dismembered the kids, or I don't know exactly how many kids. He just said he dismembered them. He sucked the blood from the penis and scrotum and put the balls in his mouth.

Echols, in another argument relating to sufficiency of the evidence, contends that the verdict in the penalty phase was erroneous because the jury refused to find, as a mitigating circumstance, that he had no prior history of criminal activity. The jury was given AMI Crim. 1509, which included the mitigating circumstance of no significant prior history of criminal activity. It is important to note that this mitigating factor is set out as "no significant prior history of criminal activity," and not "no significant prior history of prior convictions." Ark. Code Ann. § 5-4-605(6) (Repl. 1993). The jury found that Baldwin had no significant history of criminal activity, but refused to make the same finding for Echols. This indicates that the jury carefully weighed the evidence and determined that Echols should not be credited with this mitigating factor. Even so, Echols contends the jury committed error in refusing to find that he had no significant prior history of criminal activity.

Echols and the State are in dispute about our law on this point, so we set out our applicable holdings. In *Bowen* v. *State*, 322 Ark. 483, 911 S.W.2d 555 (1995), the mitigating circumstance sought by the defendant was mental illness. Bowen adduced strong evidence of mental illness, but the jury did not find that mental

illness was a mitigating circumstance. We held that even if the evidence of the defendant's mental illness was uncontradicted, the jury was not required to believe the defendant's evidence and was not required to find such a mitigating circumstance. "A jury is not required to find a mitigating circumstance just because the defendant puts before the jury some evidence that could serve as the basis for finding the mitigating circumstance." *Id.* at 497, 917 S.W.2d at 561.

In *Hill v. State*, 289 Ark. 387, 713 S.W.2d 223 (1986), we held that the jury did not have to find an eighteen year old's youth was a mitigating factor. We quoted *Giles v. State*, 261 Ark. 413, 421, 549 S.W.2d 479, 483 (1977), and held that "[a]ny hard and fast rule as to age would tend to defeat the ends of justice, so the term youth must be considered as relative and this factor weighed in the light of varying conditions and circumstances." *Id.* at 396, 713 S.W.2d at 237.

In *Giles v. State*, 261 Ark. 413, 549 S.W.2d 479 (1977), the jury found no mitigating circumstances. We held that the jury did not err in refusing to find that the defendant's youth was a mitigating factor. However, we held that the jury erred in failing to find, as a mitigating factor, the fact that the defendant committed the crime while his capacity to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect. The record in *Giles v. State* was replete with evidence that the defendant was an imbecile and had organic brain syndrome "to the extent that the conclusion [was] inescapable that the capacity of Giles to conform his conduct to the requirements of law, when the capital felony was committed, was impaired as a result of mental defect." *Id.* at 424, 549 S.W.2d at 485. We wrote, "The jury was not free to arbitrarily disregard reasonable testimony, where other testimony is supportive, rather than conflicting, and no questions of credibility are to be resolved, and it cannot be said that it is physically impossible or that there is no reasonable probability that it is true." *Id.*

In summary, our holdings provide that a jury may generally refuse to believe a defendant's mitigating evidence, but when there is no question about credibility and, when, in addition, objective proof makes a reasonable conclusion inescapable, the jury cannot arbitrarily disregard that proof and refuse to reach that conclusion. Here the jury was faced with neither indisputable credibility nor objective proof that made a reasonable conclusion inescapable. To the contrary, there was substantial evidence of Echols's history of

prior criminal activity.

 Echols admitted on cross-examination in the penalty phase of the trial that he had an altercation with his father in which a knife was involved and the police were called. He admitted he was hospitalized that same day, and when his father came to the hospital, "I told him I would eat him alive." He admitted he tried "to claw the eyes out" of a student. Perhaps the most compelling testimony on this point came from the cross-examination of Dr. James Moneypenny, a psychologist who testified for Echols. Dr. Moneypenny admitted that Echols had "an all powerful God-like image of himself" and that his parents were concerned with his satanism or devil worship. Dr. Moneypenny admitted that Echols's medical records contained the following notations of statements by Echols:

> I want to go where the monsters go. Pretty much hate the human race. Relates that he feels people are in two classes, sheep and wolves. Wolves eat sheep.

> Echols explains that he obtains his powers by drinking blood of others. He typically drinks the blood of a sexual partner or a ruling partner. This is achieved by biting or cutting. It makes me feel like a god.

> Echols describes drinking blood as giving him more power and strength ... He has also agreed to continue to discuss his issues with power and control as related to his practice of rituals.

> I just put it all inside. Describes this as more than just anger like rage. Sometimes he does 'blow up.' Relates that when this happens, the only solution is to hurt someone. Echols reports being told in the hospital that he would be another Charles Manson or Ted Bundy. When questioned on his feelings he states, "I know I'm going to influence the world. People will remember me."

The jury, having heard the foregoing, did not arbitrarily refuse to find that Echols had no significant history of criminal activity.

### Severance Arguments

The Prosecuting Attorney jointly charged Misskelley, Echols, and Baldwin with the three capital murders. The trial court granted

a severance to Misskelley, and he was tried and convicted. That left Echols and Baldwin jointly charged. Prior to their scheduled trial, both moved for severance, and each renewed the motions at various times during the trial, including at the close of the State's case. Neither argued for a severance of the three capital murder charges; rather, each argued that he should be granted a separate trial from the other. The trial court denied all of the motions. Both Echols and Baldwin assign as error the trial court's rulings denying them separate trials.

■ Joinder and severance procedure is governed by Ark. R. Crim. P. Article VI. These rules are calculated to promote the expeditious disposition of criminal cases without putting undue strain on prosecutorial or judicial resources, but, at the same time, without causing prejudice to joint defendants. Rule 21.2 provides for the joinder of defendants when the crimes were part of a joint scheme or plan and so the capital murder charges were properly joined. The issue is whether the trial court erred in refusing to grant a severance for the accuseds' trials. Rule 22.3 provides that a trial court shall grant a severance if it is deemed appropriate to promote a fair determination of the guilt or innocence of one of the defendants.

■ Trial courts have discretion to grant or deny a severance and on appeal we will not disturb the ruling in the absence of an abuse of that discretion. *Hallman v. State*, 264 Ark. 900, 575 S.W.2d 688 (1979). In *McDaniel v. State*, 278 Ark. 631, 648 S.W.2d 57 (1983), we held that, in determining whether to grant a severance, a trial court should weigh: (1) whether the defenses of the defendants are antagonistic; (2) whether it is difficult to segregate the evidence; (3) whether there is a lack of substantial evidence implicating one defendant except for the accusation of the other defendant; (4) whether one defendant could have deprived the other of all peremptory challenges; (5) whether one defendant will be compelled to testify if the other does so; (6) whether one defendant has no prior criminal record and the other has; (7) whether circumstantial evidence against one defendant appears stronger than against the other. *Id.* at 638, 648 S.W.2d at 57. Subsequently, in *Rhodes v. State*, 280 Ark. 156, 655 S.W.2d 421 (1983), we said that *McDaniel* does not say that in every case, even in capital cases, where antagonistic defenses are presented the trial court must grant a severance, but merely that when defenses are antagonistic the trial court must be

particularly careful that neither defendant is "unduly jeopardized" by a joint trial. *Id.* at 158-59, 655 S.W.2d at 422. More recently, we have written that the presence of any one of the factors does not necessarily require severance, as there are multiple factors to consider. *Rockett* v. *State*, 319 Ark. 335, 891 S.W.2d 366 (1995).

Almost all of the factors clearly weigh in favor of a joint trial. The joint trial was lengthy, lasting seventeen days, and perhaps separate trials would have taken twice as long and required twice as many jurors; the evidence was not difficult for the jury to segregate; the evidence was not significantly stronger against one defendant than the other; the testimony of one did not compel the other to testify; and there was no significant disparity in criminal records of the defendants. The trial judge made various comments when denying the severance motions, and those comments reflect that he thought the jurors could distinguish the evidence and apply the law intelligently to each offense and to each defendant.

The only argument that is of any consequence is the argument about antagonistic defenses. Echols and Baldwin argue that they had conflicting trial strategies, and, as a result, their defenses were antagonistic. The State's response is that antagonistic defenses arise only when each defendant asserts his innocence and accuses the other of the crime. Certainly, we have held that antagonistic defenses arise when each defendant asserts his innocence and accuses the other of the crime, and the evidence cannot be successfully segregated. *Cooper* v. *State*, 324 Ark. 135, 919 S.W.2d 205 (1996); *Butler* v. *State*, 303 Ark. 380, 797 S.W.2d 435 (1990); and *McDaniel* v. *State, supra.* But those are not the facts before us. Closer to the facts of this case, but not wholly dispositive of the argument, we have held that when there was no reason the jury could not have believed both defenses, the defenses were not antagonistic. *Cooper* v. *State*, 324 Ark. at 140, 919 S.W.2d at 209. Other courts have similarly held that where there was an evidentiary basis for the jury to decide each defendant's case separately, there was no error in denying severance just because of inconsistent strategies. *E.g., United States* v. *Jenkins*, 496 F.2d 57, *cert. denied*, 420 U.S. 925 (1974); *see also* Wade R. Habeeb, Annotation, *Antagonistic Defenses as Ground for Separate Trials of Codefendants in Criminal Case*, 82 A.L.R.3d 245, 264 (1978).

Correspondingly, the Fifth Circuit Court of Appeals has written:

> [W]e hold that the defense of a defendant reaches a level of antagonism (with respect to the defense of a co-defendant) that compels severance of the defendant, if the jury, in order to believe the core of the testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of this co-defendant.

*United States* v. *Berkowitz*, 662 F.2d 1127, 1134 (5th Cir. 1981).

The Eleventh Circuit Court of Appeals followed the Fifth Circuit's statement and applied it with the following four-step analysis:

> (1) Do the alleged conflicts with co-defendant's defenses go to the essence of the appellant's defense?
>
> (2) Could the jury reasonably construct a sequence of events that accommodates the essence of both defendants' defenses?
>
> (3) Did the conflict subject the appellant to compelling prejudice?
>
> (4) Could the trial judge ameliorate the prejudice?

*Smith* v. *Kelso*, 863 F.2d 1564, 1568 (11th Cir. 1989).

In summary, unless conflicting strategies go to the essence of co-defendants' defenses, and the conflicting strategies are so great that both defendants' defenses cannot be accommodated by the jury, a trial court is not required to grant a severance. Here, the alleged conflicting strategies did not reach that level. The defense of each, in effect, was that he did not commit the crimes. Echols presented an alibi defense that he was visiting friends with his parents when the murders took place. Baldwin likewise presented an alibi defense that relied upon the fact that he was at school the day of the murders, was at home by ten o'clock that night, and was never placed near the scene. Echols's arguments about conflicting strategy because of pretrial publicity and the reason he took the name "Damien" did not go to the essence of his defense and did not conflict with Baldwin's defense. Similarly, Baldwin's complaints that Echols was placed near the scene, but he was not seen there, do not go to the core of his defense that he had nothing to do with the crimes. The contention that Baldwin could have possibly argued that Echols placed the knife behind his trailer does not relate to the core of his general denial. Baldwin contends he was entitled to a

severance because Echols testified at trial, but nowhere in Echols's testimony did he implicate Baldwin. These alleged "conflicts in strategy" did not subject either defendant to a compelling prejudice.

The only alleged conflicts in strategy that are of any significance are Echols's allegation that Baldwin said that he was under the influence of Echols, and the complaints of both appellants that their strategy conflicted on how to deal with the evidence of the occult activities. Echols's argument about Baldwin stating that he acted under his influence is factually inaccurate. That statement was made during counsel's closing argument, and counsel actually said that Baldwin might be vulnerable to a finding of guilt by association, since he and Echols were friends. This statement by counsel, apparently made in derision of the prosecution, clearly did not cause a conflict with Echols to the extent that it mandated severance. Thus, we are left with only the complaints about strategy in how to deal with the evidence of occult activities. Echols contends that his strategy would have been to openly admit all evidence of satanic worship in order to show its absurdity, while Baldwin contends that he wanted to exclude all of the evidence. Again, this alleged difference in strategy did not go to the general denial. Moreover, the jury obviously did not think the proof of occultism was absurd, and it is doubtful that Echols would have freely admitted satanic worship as a matter of strategy, even if he had a real choice in the matter. Even had the trial court granted motions for severance, the expert testimony would have been admitted in a trial against Echols, and it also would have been admitted against Baldwin, because of Michael Carson's statement that Baldwin told him he sucked blood from Christopher Byers, a satanic-type act. In sum, this alleged difference in strategy did not go to the essence of either defense, did not prevent the jury from considering either defense, did not unduly jeopardize a fair trial, and did not mandate a severance.

Baldwin separately argues that the trial court erred in refusing to grant a severance when the deputy prosecutor questioned Echols about his doodles on a piece of paper. The argument is procedurally barred. Baldwin's argument to the trial court was that he was not notified, through discovery, of the paper. He argues to this court, as he did to the trial court, that the questioning, coupled with the fact that he was not provided the paper during discovery, entitled him to a severance. At trial the deputy prosecu-

tor acknowledged that the State had inadvertently violated the discovery rules. Baldwin responded that he would be satisfied with a cautionary instruction to the jury that the testimony on this point could only be used against Echols. The trial court gave the requested cautionary instruction. Baldwin's counsel responded, "That satisfies us, Your Honor." Baldwin's counsel again requested a severance, but did not mention the piece of paper with the doodles on it. The trial court denied the motion and again instructed the jury to consider the evidence only against Echols, and not Baldwin. Thus, Baldwin did not ask for a severance because of admission of a piece of paper with doodles drawn on it by Echols, and he cannot make the argument for the first time on appeal. *Spears v. State*, 321 Ark. 504, 905 S.W.2d 828 (1995).

Baldwin next argues that his conviction should be reversed because the trial court made a "binding commitment" to grant a severance if Echols testified, and that Echols testified but the trial court did not grant a severance. In pretrial, the trial court stated that in the event one of them testified, the other might then be compelled to do so, and, "There's case law on that, and the other defendant would be entitled to an immediate mistrial." In a similar case, we held that this kind of ruling does not amount to a "binding commitment." In *Ruiz v. State*, 299 Ark. 144, 772 S.W.2d 297 (1989), the trial judge told the defendants that if a conflict developed in selection of jurors, a severance would be granted, because "that's the law." *Id.* at 151, 772 S.W.2d at 301. This comment was made after the trial judge refused to enlarge each defendant's number of peremptory challenges. Later, the defendants disagreed over some jurors, and moved for a severance, which was denied. *Id.* We held that the trial judge had not made a binding commitment, but had alluded to the law as set forth in *McDaniel v. State*, which states that one factor favoring severance is when one defendant deprives the other of peremptory challenges. We held that the trial court did not abuse its discretion by denying severance when the facts had not developed to that point. Similarly, Echols did not implicate Baldwin when he testified, and, as a result, the trial court did not abuse its discretion in denying the severance.

Baldwin next insists that severance was required in these capital cases as a matter of law. Before the Arkansas Rules of Criminal Procedure were adopted, the trial court had discretion to grant severance of defendants in all cases except capital cases, where

they were granted severance as a matter of right under Ark. Stat. Ann. § 43-1802 (Repl. 1977). Baldwin contends that the statute, an initiated act, is still in effect. To the contrary, in *McDaniel* v. *State*, 278 Ark. 631, 648 S.W.2d 57 (1983), we held that the cited statute had been superseded by Ark. R. Crim. P. 22, which gives the trial court discretion to grant or deny a severance in all cases. *Id*. at 636, 648 S.W.2d at 59. In *Hallman* v. *State*, 264 Ark. 900, 575 S.W.2d 688 (1979), we held that since the adoption of Ark. R. Crim. P. 22, capital defendants no longer have a right to separate trials. *Id*. at 904, 575 S.W.2d at 691. However, in *Clines* v. *State*, 282 Ark. 541, 543, 669 S.W.2d 883, 885 (1984), in dicta in a *per curiam* opinion, the court expressed doubt as to whether the act had been superseded. We should not have expressed any doubt about the matter in *Clines* because our holdings in *McDaniel* and *Hallman* are clear that the act has been superseded by Ark. R. Crim. P. 22. Moreover, Ark. Stat. Ann. § 43-1802 has been repealed. The General Assembly adopted the Arkansas Code of 1987 Annotated by Act 267 of 1987. Section 4(a) of Act 267, codified as Ark. Code Ann. § 1-2-103(a) (1987), specifically provides that "[a]ll acts, codes and statutes, and all parts of them and all amendments to them of a general and permanent nature in effect on December 31, 1987 are repealed," with some exceptions not material to this case. Section 4(a) of Act 267 repealed Ark. Stat. Ann. § 43-1802 and did not reenact it. Ninety-seven of the one hundred members of the House voted for Act 267, and thirty-three of the thirty-five members of the Senate voted for it. 2 *Journal of the House* 1699 (1987); 3 *Journal of the Senate* 2134-35 (1987). Thus, Act 267 had the two-thirds vote needed from each chamber of the General Assembly to repeal an initiated act under Amendment 7.

### Suppression of Evidence Arguments

Echols and Baldwin make a number of arguments contending that the trial court erred in denying their motions to suppress evidence. The facts underlying the arguments are recited as follows. On June 3, 1993, nighttime search warrants were executed for the residences of Echols and Baldwin. The warrants each authorized a search for the following:

> black t-shirt; blue jeans with holes in knees; lace-up boots; briefcase and contents of briefcase with photographs of young white males; knives; any items contained in a list of items to compare with Arkansas Crime Lab Evidence, which

consisted of "blue, green, red, black, and purple fibers, blue, yellow, red, paint or plastic, and blue, red waxing type substance"; and cult or Satanic materials.

A red robe, fifteen black t-shirts, and a white t-shirt were seized from Baldwin's house. Two notebooks that appeared to have satanic or cult writings in them, a red t-shirt, blue jeans, and boots were taken from Echols's residence.

Both appellants make a number of suppression arguments. The first of these is that Detective Bryn Ridge's affidavit and testimony supporting the warrant were false, and consequently the trial court erred in refusing to suppress the evidence seized from the searches.

In *United States* v. *Leon*, 468 U.S. 897 (1984), the Supreme Court held that the good-faith exception does not apply when the issuing magistrate was misled by an affiant who either knew the information given was false or acted in reckless disregard of its truth or falsity. *Id.* at 923. *Franks v. Delaware*, 438 U.S. 154 (1978), provides the test for determining when a warrant falls outside the *Leon* good-faith exception. Under *Franks* v. *Delaware*, a warrant should be invalidated if a defendant shows by a preponderance of the evidence that: (1) the affidavit contained a false statement which was made knowingly, intentionally, or recklessly by the affiant; and (2) the false statement was necessary to a finding of probable cause. *Id.* at 155-56. Further, if such a finding is made, the false material should be excised and the remainder of the warrant examined to determine if probable cause still exists. *Id.* If the truthful portion of the warrant makes a sufficient showing of probable cause, the warrant will not be invalidated. *Id.* The burden of showing that an affiant knowingly and recklessly included a false statement is upon the challenger of the affidavit. *Id.* at 171.

In *Pyle* v. *State*, 314 Ark. 165, 862 S.W.2d 823 (1993), we held that the standard set out in *Franks* v. *Delaware* requires a knowing intent to deceive, or a reckless disregard of truth. *Id.* at 175, 862 S.W.2d at 828. "Matters omitted must be material circumstances which contradict or dispel the incriminating factors in the affidavit and which render what is in the affidavit effectively false because of their nondisclosure." *Biggers v. State*, 317 Ark. 414, 421, 878 S.W.2d 717, 721 (1994).

The affidavit of Detective Ridge contained the false statements that appellants contend invalidate the warrant. In the affidavit,

Detective Ridge stated that Jessie Misskelley told him the victims were tied with brown rope when they were actually tied with shoestrings, and that the killings took place in the afternoon. The latter statement is of no consequence because the record reveals that the issuing magistrate, Judge Rainey, expressed some concern about the time discrepancy, and, as a result, Inspector Gary Gitchell testified under oath that he had taken an additional statement from Misskelley, and, in it, Misskelley said the crimes took place around 7:00 p.m.

Even if these two statements were false in material matters, and even if Detective Ridge knew them to be false, the rest of the warrant still made a sufficient showing for probable cause. *See Franks* v. *Delaware, supra.* The warrant contained a sufficient showing of the facts that Misskelley said he, Baldwin, and Echols committed the murders; that Misskelley had knowledge of details of the crime not known to the public; and the statement that evidence connecting them to the crime could be found in the homes.

Baldwin separately argues that Detective Ridge knowingly and intentionally misrepresented the truth when he swore that Echols, Baldwin, and Misskelley were members of a cult. We summarily dismiss this argument because Jessie Misskelley told Inspector Gitchell that the three were in a cult, and Detective Ridge testified at the suppression hearing that he had learned from other sources that the three were in a cult. Thus, Baldwin did not meet his burden of showing that Detective Ridge knowingly and intentionally stated a falsehood. *See Franks* v. *Delaware, supra.*

Echols and Baldwin next contend that the circuit judge erred in finding that the municipal judge who issued the warrants was neutral and detached in determining whether to issue the warrants. Detective Bryn Ridge testified that Judge Rainey informed the officers "as to the elements that needed to go in the affidavit in order for it to be a legal document." Judge Rainey testified that he advised the officers that, after the search warrant had been executed, they should make sure that they wrote out everything they did on the affidavit.

The general rule for the application of the Fourth Amendment exclusionary rule to evidence seized under an invalid warrant is set out in *United States* v. *Leon,* 468 U.S. 897 (1984). There, the Court carved out the good-faith exception to the re-

quirement of a valid warrant. *Id.* at 922. One of the errors that an officer's good faith will not cure is that which occurs when the magistrate wholly abandons his detached and neutral judicial role. *Id.* When a judicial officer becomes so involved in the investigation as to be deemed a participant, he has abandoned this role. *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979). For example, when a magistrate accompanies the police to the scene and orders seizure of items, his objectivity is lost. *Id.* at 327. Likewise, when a magistrate gives the prosecutor directives about areas of inquiry or grants immunity to witnesses, he has lost his objectivity. *See State v. Guhl*, 140 Ga. App. 23, 230 S.E.2d 22 (1976). Here, the proof showed that the issuing magistrate stated the elements necessary for a valid warrant, and that included telling the officers to record on the warrant the actions they took when they executed the warrant. On such proof we cannot say that the ruling of the trial court was clearly in error. *Hudson v. State*, 316 Ark. 360, 872 S.W.2d 68 (1994).

■ Both Echols and Baldwin contend that the trial court erred in ruling that Jessie Misskelley was a reliable informant. Again, we cannot say that the trial court's ruling was clearly against the preponderance of the evidence. *Hudson v. State, supra*. Even though Misskelley's initial statement was in error about the ligatures and the time of the killings, he corrected the latter and he clearly knew that Christopher Byers had been castrated and that one of the victims had been cut in the face. This information was not known by the public at the time he supplied this information. Further, Detective Ridge corroborated these statements by his own knowledge gained at the crime scene, and through contacts at the state crime laboratory. Even more important, Misskelley implicated himself in the murders because he admitted that Michael Moore attempted to escape from the crime scene, and he chased and caught Moore and brought him back. Thus, the finding that Misskelley was a reliable informant was not clearly in error. *See Wilson v. State*, 317 Ark. 548, 878 S.W.2d 755 (1994), *rev'd on other grounds*, 115 S. Ct. 1914 (1995); *Watson v. State*, 291 Ark. 358, 724 S.W.2d 478 (1987).

■ Both Echols and Baldwin next contend that the warrant did not describe with particularity the items to be seized. We quickly dismiss the argument. All of the items to be seized were described with particularity, except the fibers to be seized for the crime laboratory, and it is difficult to think of a way the warrant

could have been more specific than to describe, as it did, the blue, green, red, black, and purple fibers; blue, yellow, red, paint or plastic; and blue or red waxing-type substance.

■ Both appellants also contend that the warrant authorized a "dragnet" fishing expedition for "mere evidence." In *Warden v. Hayden*, 387 U.S. 294 (1967), the Supreme Court held that the Fourth Amendment allows the seizure of not only the implements of the crime, but also allows the seizure of mere evidence providing that there is a probable cause to believe the evidence sought will aid in a conviction.

Echols and Baldwin next contend that the trial court erred in refusing to suppress the evidence seized because it was a nighttime search.

The nighttime clause in the affidavit stated:

> Your affiant prays that this SEARCH WARRANT be approved for both night time and day time service for the following reasons:

> A. The objects to be searched for are in imminent danger of removal, could be destroyed or disposed of as suspects are close friends and members of a close-knit cult group. It is extremely likely that information of the detention of one of the cult members will result in the immediate destruction of items of evidence, or place such objects to be seized in danger of imminent removal. One of the suspects is in custody at the time of the execution of the affidavit.

Rule 13.2 of the Arkansas Rules of Criminal Procedure provides for nighttime searches as follows:

> Except as hereafter provided, the search warrant shall provide that it be executed between the hours of six a.m. and eight p.m., and within a reasonable time, not to exceed sixty (60) days. Upon a finding by the issuing judicial officer of reasonable cause to believe that:

> . . . .

> (ii) the objects to be seized are in danger of imminent removal; . . . .

Ark. R. Crim. P. 13.2(c)(ii).

In reviewing whether the requirements of the rule were met, we conduct an independent determination based upon the totality of the circumstances and reverse only if the trial court's ruling was clearly against the preponderance of the evidence. *Richardson v. State*, 314 Ark. 512, 863 S.W.2d 572 (1993). The evidence presented to the magistrate from whom a nighttime search is requested must be of facts justifying a warrant rather than mere conclusions. *Neal v. State*, 320 Ark 489, 898 S.W.2d 440 (1995).

Here, there were facts stated to support the conclusion that the evidence was in danger of imminent removal. Detective Ridge testified at the hearing that his investigation revealed that appellants and Misskelley were close-knit members of a cult, and, upon Echols and Baldwin discovering that Misskelley had been taken into custody, Echols and Baldwin were likely to destroy any evidence that might be in their possession or at their residence, such as photographs, knives, and clothing. In light of this testimony, the trial court's conclusion that the nighttime search was justified was not against the preponderance of the evidence. *See Neal v. State*, *supra.*

### Evidence Arguments

Echols and Baldwin make numerous arguments about evidentiary rulings throughout the trial. Many of their objections concerned admission of evidence regarding the occult. The State sought to prove that the murders were cult-related and that someone with Echols's interest in the occult could have committed the murders. Baldwin argued throughout that the State had failed to connect him with occult activity.

*Occult activity*: In one of these arguments, Echols contends that the trial court erred when it ruled that Dr. Dale Griffis was qualified as an expert in the field of occultism. Echols contends that Dr. Griffis was not qualified as an expert because he received a Masters degree and Doctor of Philosophy degree from a university that, although state certified, was not nationally accredited. Also, he wrote his dissertation with another person, and he did not demonstrate that he had reputable training, education, and experience.

Qualification of expert witnesses is within the sound discretion of the trial court and will not be reversed absent a showing of abuse. If there is a reasonable basis to find that the witness has knowledge of a subject beyond that of ordinary knowl-

edge, the witness may be qualified as an expert. *Stout v. State,* 320 Ark. 552, 898 S.W.2d 457 (1995). Here, proof showed that Dr. Griffis holds an associate in arts degree and a bachelor's degree from an accredited institution, but his advanced degrees are from Columbia Pacific University, which is not nationally accredited. Another qualification was that his doctoral dissertation was on mind control and cults and their effects on the objectives of law enforcement. His first experience with nontraditional groups was in 1967, almost thirty years ago, and he has twenty-six years of experience in law enforcement. For short periods of time, he worked for the Los Angeles and San Francisco Police Departments, where he gained experience in nontraditional groups. He testified that he has talked to about 500 former members of the occult and read about 300 books on the subject. He testified that he receives approximately sixty-five to seventy calls a week regarding nontraditional groups, and about eighty percent of those calls are related to satanism. He has published four books on the subject. He has testified as an expert witness in state courts in Georgia, Ohio, and Michigan; in federal court in Ohio; and in two foreign countries. He has lectured in twenty-eight states and two other foreign countries. Dr. Griffis had much more than ordinary knowledge of nontraditional groups, the occult, and satanism, and the trial court did not abuse its discretion in allowing him to testify as an expert witness.

Echols next contends that Dr. Griffis should not have been allowed to testify that the murders had the "trappings of occultism" because there was no testimony that the field of satanism or occultism is generally accepted in the scientific community. The argument is without merit, as the trial court did not allow the evidence to prove that satanism or occultism is generally accepted in the scientific community. Rather, the trial court admitted the evidence as proof of the motive for committing the murders.

In a related vein, Echols makes a twofold argument that the trial court erred in allowing evidence of his interest in the occult. He argues that the ruling violated his First Amendment rights and that the trial court abused its discretion in determining that the evidence was relevant and more probative than prejudicial.

The First Amendment argument can be quickly dismissed. In *Dawson v. Delaware,* 503 U.S. 159 (1992), the Supreme Court held that the introduction of evidence of beliefs and associations violates a defendant's constitutional rights when there is no

connection between those beliefs and associations and the crime. But the Court expressly distinguished *Barclay v. Florida*, 463 U.S. 939 (1983), in which it held that dissident beliefs and racial hatred stemming from the defendant's membership in the Black Liberation Army were relevant to the murder of a white victim, and, as such, his First Amendment rights were not violated. *Dawson v. Delaware*, 503 U.S. at 164. The case at bar falls within the ambit of *Barclay v. Florida*.

Echols makes several relevancy arguments regarding physical evidence of occult activity. The trial court allowed the State to introduce into evidence a journal that contained matters handwritten and drawn by Echols. The entries contain numerous images of death, as well as references to rotting flesh and dead children. The State focused upon an entry that said "I want to be in the middle. In neither the black nor the white. In neither the wrong nor the right." The State offered the statement to explain the confusion expressed by the occult expert, Dr. Griffis, that some of the symbols in one of Echols's books were from the Wiccan, or "white magic" religion, and others from satanism, or "black magic," and the two are not consistent. Echols first objected on the ground of the best-evidence rule, and the State responded that it would supply the original. Echols's counsel responded, "We request that the entire book and all my client's writings be introduced into evidence. We object to part being taken out." The trial court ruled that the entire journal would be received. Thus, the trial court ruled in Echols's favor, and a party cannot obtain relief from a favorable ruling. *Smith v. State*, 316 Ark. 407, 872 S.W.2d 842 (1992).

The trial court also allowed in evidence, over Echols's objection, items taken from Echols's room in a juvenile court proceeding in 1992. The items had been kept in his juvenile court file. These items included a dog's skull; a manual; a funeral register upon which Echols had drawn a pentagram and upside-down crosses and had copied various spells; a heavy-metal poster depicting graveyards; a skateboard magazine; and pictures of various posters. On appeal, Echols contends that the items were not admissible because they were not relevant and because they came from his juvenile court file.

The State's expert, Dr. Griffis, testified that the manner of the killings, the age of the victims, the way the victims

were tied, the removal of genitals, and the evidence of bloodsucking were indicative of occult activity, and he referred to five of the exhibits from the juvenile court file during his testimony. The evidence was relevant to show motive. We have said that when the purpose of evidence is to show motive, anything and everything that might have influenced the commission of the act may, as a rule, be shown. *Cooper* v. *State*, 324 Ark. 135, 919 S.W.2d 205 (1996). The State is entitled to produce evidence showing circumstances which explain the act, show a motive for killing, or illustrate the accused's state of mind. *Smith* v. *State*, 310 Ark. 247, 837 S.W.2d 279 (1992). Further, a trial court's ruling on relevancy, as well as prejudicial impact, is afforded great deference by a reviewing court and will not be disturbed absent an abuse of discretion. *Bennett* v. *State*, 297 Ark. 115, 759 S.W.2d 799 (1988).

It is true that the items came from Echols's juvenile court files, but Ark. Code Ann. § 9-27-309(a) gives the juvenile court discretion to open files. The trial court noted that the juvenile court had, by order, opened the files for the State.

A book, *Never on a Broomstick*, which is about the history of witches, was found in Echols's room after the murders. Again, it was relevant to show Echols's interest in the occult.

Echols and Baldwin make yet another relevancy argument. In its case-in-chief, the State called Jerry Driver, a juvenile officer, to testify that he saw Echols, Baldwin, and Misskelley walking together six months before the murders, and that they were wearing long black coats and carrying long sticks or staffs. Echols and Baldwin each made an objection based on relevancy. The trial court ruled that the murders could have been committed with staffs and that they could have been occult murders; therefore, the evidence was relevant.

To be relevant, it is not required that evidence prove the entire case or even a single issue. *Ford Motor Co.* v. *Nuckolls*, 320 Ark. 15, 894 S.W.2d 897 (1995). All that is required is that it have "any tendency" to make any fact that is of consequence to the determination of the action more or less probable. Ark. R. Evid. 401. Here, the State's theory was that the murders were cult-related, and there was additional evidence about occult practices. This evidence provided a circumstantial link and was therefore relevant.

Baldwin argues that the occult evidence should not have been

admitted because there was "little if any" evidence to link him to such activity, and the only reason for it to be admitted against him was to inflame the jury. Prior to trial, Baldwin filed a motion in limine to prevent the State from eliciting testimony that the crimes were occult-related without first conducting an *in camera* hearing to determine that there was a sufficient basis to find that he was involved in such activities and that the activities were a motive in the homicides. The trial court granted the motion "until such time as the Court is convinced in an in camera proceeding that there is competent evidence that [Baldwin] was involved in occult and/or occultic type activities and/or that this crime is indicative of a ritualistic occult killing."

The trial court subsequently found that Michael Carson's testimony that Baldwin told him he had dismembered one of the boys, sucked the blood from his penis and scrotum, and put the testicles in his mouth was evidence by which a jury could conclude that he was involved in occultic-type activities. From the *in camera* testimony of Dr. Dale Griffis, an expert on ritual killings, there was evidence by which a jury could find that the crimes were a ritual killing. Dr. Griffis stated that one of the facts that led him to believe that the killings were cult-related was that Christopher Byers was castrated and had had the blood sucked from his penis. Thus, there was sufficient evidence of Baldwin's participation in occult activities, and the trial court correctly allowed the evidence. *See Snell* v. *State*, 290 Ark. 503, 721 S.W.2d 628 (1986). In *United States* v. *Mills*, 704 F.2d 1553 (11th Cir. 1983), in affirming a trial court's decision to admit evidence that the defendant was associated with the Aryan Brotherhood, a white supremacist group that exists in prisons, the Eleventh Circuit Court of Appeals said:

> Such evidence ... is now considered proper if it is linked together in time and circumstances to the crime charged, or if it forms an "integral and natural" part of the account of the circumstances of the crime, or is necessary "in order to complete the story of the crime on trial."

*Id.* at 1559 (citations omitted).

Echols called Robert Hicks as an expert witness who has done extensive studies and consulting about cult crimes. Hicks testified that the murders were not cult-related. Echols's counsel sought to question Hicks about the opinion of Ken Lanning, an FBI expert

on cult crimes. Counsel asked Hicks if he was familiar with Lanning's writings and if he knew Lanning's opinion on cult-related crimes. The State objected on the basis of hearsay, and the trial court sustained the objection. The court said that Hicks could state his own opinion, but not the opinion of someone else. Echols assigns the ruling as error.

The scholarly treatise exception, Ark. R. Evid. 803(18), provides:

> Learned treatises. To the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, *statements contained in published treatises*, periodicals, or pamphlets on the subject of history, medicine, or other science or art, established as a reliable authority by testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

*Id.* (emphasis added). The rule applies to a particular statement from a particular treatise, not to a general opinion of another expert based upon a generalized familiarity with the expert. Here, no foundation was laid about a particular treatise to which the witness could refer, and no foundation was laid about the reliability of the expert on the subject. Before a treatise may be used, its reliability must be established. *Davies* v. *State*, 286 Ark. 9, 688 S.W.2d 738 (1985). Since the trial court was not apprised of a particular treatise, or its reliability, the hearsay objection was correctly sustained. Moreover, Echols could not have suffered any prejudice from the ruling because the information was later given to the jury. On redirect, Echols's counsel asked Hicks if his book gave the following Lanning statement, "Bizarre crime and evil can occur without organized satanic activity. The law enforcement perspective requires that we distinguish between what we know and what we are not sure of." Hicks said the statement was in his book, and he agreed with it.

On cross-examination, the State asked Hicks about the philosophies of Aleister Crowley, a turn-of-the-century British writer who supposedly condoned human sacrifice. Echols objected on the ground that he had not been allowed to ask about quotations from Lanning. Echols's counsel stated that both sides should be

treated equally. The court responded that the witness could give his own opinion, or testify about his familiarity with the works of another person in the field, but he could not adopt the other expert's opinion as his own. After Hicks testified that he had "mixed feelings" about whether Crowley espoused human sacrifice, the State asked if Hicks was familiar with Crowley's book, *Magic in Theory and Practice*, and he said that he was. There was no attempt to prove reliability, but Echols did not object to this lack of foundation and does not complain of it on appeal. Rather, in this point, he argues that the law-of-the-case doctrine prohibited the court from making a different ruling on the same argument. The argument is without merit. The rulings were not inconsistent, but, even had they been inconsistent, the law-of-the-case doctrine was not applicable. While the doctrine is not limited to appeals and may be applied to issues raised in a continuing lawsuit, *Fairchild v. Norris*, 317 Ark. 166, 876 S.W.2d 588 (1994), when applied in a continuing suit, the doctrine is different from when applied to subsequent appeals. As Justice Holmes wrote in *Messenger v. Anderson*, 225 U.S. 436 (1912), this doctrine, when applied to the effect of previous orders on the later action of the court rendering them in the same case, "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." *Id.* at 444; *see also* 18 Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, *Federal Practice and Procedure* § 4478 (1996). In the present case it is questionable whether this was the "same issue," but even if it were, the trial court had the power to reconsider its ruling. In any event, Echols suffered no prejudice because he got the Lanning quotation in evidence.

*Other suspects*: Throughout the trial, both appellants attempted to put in front of the jury evidence of other suspects. The following arguments involve rulings on evidence that both appellants sought to introduce to show that someone else committed the killings.

Echols assigns as error a ruling that, he contends, arbitrarily stopped him from examining John Mark Byers. Echols called John Mark Byers, the stepfather of victim Christopher Byers, during his case-in-chief. Byers was considered a suspect at one time, and the police had questioned him about human blood of the same type as Christopher's that was found on a Kershaw hunting knife that belonged to John Byers. Echols contends that his direct examination of Byers was arbitrarily stopped by the trial court. The facts

underlying the argument are as follows. Earlier, during Inspector Gary Gitchell's testimony, Echols's counsel asked Gitchell if he had questioned Byers about the murders before charges were filed against Echols. Gitchell answered affirmatively. Echols asked Gitchell about some of the questions he had asked Byers and about some of Byers's responses. The trial court ruled that the testimony was hearsay and that Echols's counsel could ask the questions of Byers when he took the stand. Later, when he called Byers during his defense, Echols's counsel began reading Byers the questions Inspector Gitchell had asked him. The court ruled that the form of Gitchell's questions was not relevant and directed Echols's counsel to ask Byers about the circumstances, and if Byers contradicted any statement he had given Gitchell, then Echols's counsel could "read every word of [Byers's statement to Gitchell] that is contrary to what his answers were."

On appeal, Echols assigns the ruling as error and contends that he was not allowed to question Byers about the kind of knife he had, if he had ever taken the knife hunting, if he used the knife, and why DNA tests of the blood on the knife matched his blood. The trial court did not arbitrarily stop Echols's counsel from asking proper questions. In fact, the record shows that Echols's counsel was allowed to ask the questions he complains that he was not allowed to ask. Echols's counsel showed Byers a Kershaw hunting knife and asked if he could identify it and whether it belonged to him. Byers responded affirmatively to both questions. Echols counsel asked Byers if he had ever taken the knife deer hunting, and he responded "no." When asked if he had ever used the knife, he said he had used it to trim his toenails and had attempted to trim some venison with it. At this point he impeached Byers with his earlier answer to Gitchell in which he said that the knife had not been used at all. Finally, he asked Byers if, to his knowledge, blood had been found on the knife. He responded that he had no idea how any blood could have gotten on the knife, except that he remembered cutting his own thumb. On each occasion when one of Byers's answers was inconsistent with his statement to Gitchell, Echols's counsel was allowed to read from Gitchell's report.

Echols also sought to ask Byers if he had been sodomized when he was eighteen, whether he had prior drug arrests, and whether he had ever been an informant. The trial court ruled that the questions were not relevant to any issue in the trial.

On appeal, the State contends that we should not reach the point because Echols did not make a proffer. We hold that Echols made a sufficient offer of proof. Counsel stated the questions he wanted to ask and gave the answers he anticipated the witness would give. That was a sufficient offer of proof under Ark. R. Evid. 103(a)(2).

Here, Echols was attempting to show that Byers might be the one who committed the murders because he had been abused as a young man and had committed other bad acts. We have held that evidence that a third party may have committed the crime is inadmissible unless it points directly to the guilt of the third party. If it creates no more than an inference or conjecture as to the third party's guilt, it is inadmissible. *Zinger v. State*, 313 Ark. 70, 852 S.W.2d 320 (1993). We have also held that there should be sufficient connection between the evidence and the possibility of another person's guilt before it is admissible. *Larimore v. State*, 317 Ark. 111, 124, 877 S.W.2d 570, 576 (1994). Here, the facts that the witness may have been abused and may have committed unrelated bad acts created no more than a reckless inference that he murdered his stepson and the other two victims.

Echols's counsel questioned Detective Bill Durham of the West Memphis Police Department about a photographic spread of suspects he had shown to Aaron Hutcheson. In response to questions, Durham testified that he did not remember who was in the photospread and did not know if Echols's photograph was included in the spread. Echols's counsel continued to pursue the inquiry, and Durham responded a number of times that he did not know who was included in the photospread. Finally, over counsel's objection, the trial court stopped questioning on the subject because it was not relevant. Echols's purpose in the questioning was to attempt to show that there might be another suspect, or some other suspects. Certainly, an accused is entitled to show that someone else committed a crime, but an accused is not entitled to offer evidence of other suspects on a wholly speculative basis and without linking the other suspects in some manner. Here there was nothing to indicate that anyone in the photospread committed the crimes, and the trial court correctly ruled that further questioning of the officer about the photospread was irrelevant. *See Zinger v. State, supra.*

Echols next argues that the trial court erred when it refused to allow him to introduce a serologist's report from the crime laboratory. Arkansas Code Annotated § 12-12-313(a) (1987)

provides that an evidence analysis made by the State Crime Laboratory shall be received as competent evidence subject to the applicable rules of criminal procedure. The purpose of the statute is to remove reports from exclusion under the hearsay rule, not to require that they always be admitted for any reason. *Hendrix* v. *State*, 40 Ark. App. 52, 842 S.W.2d 443 (1992). Echols sought to introduce a copy of the report, not to show the analysis made by the laboratory, but to show the names of other people, primarily John Mark Byers, who were listed as suspects in the murders. The trial court ruled that the hearsay statements contained in the report were not admissible and that the names of suspects listed on the document would not be admitted unless there was some evidence to connect the suspects with the crimes. The ruling was correct. The statute removes reports from exclusion under the hearsay rule, but that does not mean that they are admissible for any reason. Moreover, evidence that a third party may have committed the crime is inadmissible unless it points directly to the guilt of the third party. If it creates no more than an inference or conjecture as to the third party's guilt, it is inadmissible. *Zinger* v. *State*, 313 Ark. 70, 852 S.W.2d 320 (1993). Further, Echols could not show prejudice because the jury was informed that John Mark Byers was a suspect.

Both Echols and Baldwin next contend that the trial court committed error when it refused to allow them to call Chris Morgan as a defense witness. Morgan lived in the West Memphis area at the time of the murders and moved to California four days afterwards. The trial court ruled Morgan could be called by appellants but, when Morgan asked for a lawyer, the trial court instructed appellants' counsel to put on another witness while Morgan consulted with counsel. After consulting with his lawyer, Morgan stated that he would invoke the Fifth Amendment privilege against self-incrimination. Appellants argued that Morgan should not be allowed to invoke a "blanket" Fifth Amendment privilege, but instead would have to claim the privilege in response to each question they chose to ask. Morgan's lawyer stated that there were federal charges pending against Morgan in Tennessee, and that there were some overlapping facts in his statements regarding these charges. The trial court ruled that appellants could not call Morgan because, under the provisions of Ark. R. Evid. 512, a witness should not be compelled to invoke his privilege in front of the jury, and that if he were forced to take the stand and invoke the privilege against self-incrimination any probative value would be substantially

outweighed by the possibility of confusing the jury. *See* Ark. R. Evid. 403.

 Rule 512(b) of the Arkansas Rules of Evidence provides, "In jury cases, proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without the knowledge of the jury." Appellants argued to the trial court that this rule applies only to the privileges delineated in Ark. R. Evid. Article V, and not to the Fifth Amendment privilege. On appeal, appellants cite no authority for the argument, and, to the contrary, Arkansas Rule of Evidence 501 states, "Except as otherwise provided by constitution or statute or by these or other rules promulgated by the Supreme Court of this State, no person has a privilege to refuse to be a witness." Ark. R. Evid. 501(a). This includes the Fifth Amendment, as it is a privilege "otherwise provided by constitution." The case of *Hamm v. State*, 301 Ark. 154, 782 S.W.2d 577 (1990), reflects the same rationale. There, we held that "neither the prosecution nor the defense is permitted to call a witness knowing that the witness will claim his testimonial privilege." *Id.* at 159, 782 S.W.2d at 580. Our reasoning in that case was that neither side should be permitted to build a case out of a series of invocations of the privilege, which would be the equivalent in the jury's minds of testimony. *Id.*

 Moreover, in addition to passing a Rule 403 balancing test, the kind of evidence appellants sought to introduce must have had a tendency to negate the defendant's guilt. *Larimore v. State*, 317 Ark. 111, 877 S.W.2d 570 (1994). This kind of evidence is inadmissible unless it points directly to the guilt of the third party. If it creates no more than an inference or conjecture as to the third party's guilt, it is inadmissible. *Zinger v. State*, 313 Ark. 70, 852 S.W.2d 320 (1993). There must be a sufficient nexus between the evidence and the possibility of another person's guilt. *Larimore v. State, supra.* Similarity and time connections are factors in determining the probativeness of the evidence, which must be weighed against the possibility of confusing the issues and wasting time. *Id.* Here, the trial court had heard a proffer and knew that his statement did not exculpate the appellants. The admission or rejection of evidence under Rule 404(b) is committed to the sound discretion of the trial court, which this court will not disturb on appeal absent a showing of manifest abuse. *Jarrett v. State*, 310 Ark. 358, 833 S.W.2d 779 (1992). The standard of review for both relevancy

determinations and the decision to admit evidence by balancing the probative value against unfair prejudice or confusion of the issues is similar. *Larimore v. State*, 317 Ark. at 124, 877 S.W.2d at 576. In sum, the trial court did not abuse its discretion in refusing to allow appellants to call Morgan and make him claim his Fifth Amendment privilege in front of the jury.

*Miscellaneous rulings*: Appellants also assign various miscellaneous evidentiary rulings as error. Baldwin argues that the trial court erred in allowing Dr. Peretti, the state forensic pathologist, to testify that in his opinion, the three victims had been sodomized. Prior to trial, Baldwin filed and argued a motion in limine seeking to exclude evidence that the boys were sodomized. The trial court denied the motion. On appeal, Baldwin argues that Dr. Peretti's testimony concerning sodomy was mere guess and conjecture because there was an absence of scientific evidence to confirm his testimony. He argues that an expert's testimony must be that his opinion represents his professional judgment as to the most likely or probable result. This argument is easily disposed of in that Dr. Peretti did not testify that it was his opinion that the victims had been sodomized, but rather testified as to the condition of the victims and the possible causes of the victims' conditions.

At trial, Dr. Peretti testified as to the injuries that the victims received. In discussing the injuries, he testified that Michael Moore had anal dilatation and redness of the anal-rectal mucosa. When asked whether those findings would be consistent with some sort of sexual trauma, Dr. Peretti testified:

> Well, you have dilatation of the anus. It could be from putting an object in the anus. But also it could be due to the fact that postmortem relaxation and the fact that the body was in water. And that could alter things, also.

Dr. Peretti further stated that Steve Branch's anus was dilated and the lining of the rectum and anus showed mild reddening, but that no further injuries were noted to the anal and rectal mucosa. He testified that Christopher Byers had genital-anal injuries.

Upon cross-examination, Dr. Peretti testified that the anuses of the victims were swabbed to determine the existence of sperm and that none was found. He testified that, in his experience, when someone was forcibly sodomized, he had always found injuries to the anal regions. He said that he would expect to find lacerations,

contusions, and abrasions, and that he would also expect to find microscopic evidence of hemorrhage. He noted that there was no injury to the anal-rectal mucosa. On redirect examination, Dr. Peretti stated that anal dilatation and the bodies being submerged in water could have caused any sperm to be washed away. He explained that if there was attempted penetration, and an object did not actually enter the anus, he would not expect to find lacerations. He also noted that there could be a sexual attack with no ejaculation and, therefore, no evidence of sperm. He further testified that the degree of lacerations and trauma to the anal area would be based on the size of the object penetrating the anus.

Baldwin's argument that the State elicited an opinion from Dr. Peretti that the boys had been sodomized is incorrect. Rather, Dr. Peretti, who was qualified as an expert in forensic pathology, testified regarding the condition of the bodies when he received them. His testimony was that the anuses were dilated and had reddening or congestion of the mucosa. When asked by the State if this condition was consistent with sexual trauma to the anal area, he answered that it would be consistent with that or postmortem relaxation and the fact that the bodies were in the water. Dr. Peretti simply explained the injuries and testified as to possible causation, consistent with his findings, as he was qualified to do.

Whether to qualify a witness as an expert is a matter left to the discretion of the trial court and the trial court will not be reversed absent an abuse of discretion. *Suggs v. State*, 322 Ark. 40, 907 S.W.2d 124 (1995). Dr. Peretti was qualified as an expert in forensic pathology without objection. Once a witness is qualified as an expert, any weaknesses in the bases for his opinions can be brought out on cross-examination, and it is then for the jury to determine the weight and credibility to give the testimony. *Id.* In the present case, Dr. Peretti testified in detail regarding possible causes of the dilatation of the anuses and the congestion of the mucosa. Though Dr. Peretti did not testify that it was his opinion that the boys had been sodomized, any strengths or weaknesses in the argument that they had been were thoroughly explored through the direct and cross-examinations of him. The trial court did not err in allowing his testimony regarding the conditions of the victims' anuses and the causes consistent with the conditions.

Baldwin next argues that the trial court erred in allowing Dr. Peretti to testify that the victims had been forced to

perform oral sex. Baldwin asserts that he objected to Dr. Peretti expressing this opinion prior to the testimony coming before the jury. His argument regarding Dr. Peretti's testimony as to oral sex is essentially the same as that he makes regarding sodomy — that Dr. Peretti's opinion was mere speculation and conjecture. Baldwin contends that scientific evidence that would confirm such an opinion was absent; there were neither injuries to the inside of the mouths nor evidence of sperm in the mouths. The State correctly responds that Baldwin did not preserve this point for appeal because he neither moved in limine to exclude Dr. Peretti's opinion concerning whether the victims were forced to perform oral sex nor objected at trial to Dr. Peretti's testimony on the subject. In short, Baldwin failed to raise this issue before the trial court. In order to preserve an issue for appeal, a specific and timely objection must be made in the trial court, apprising the trial court of the appellant's arguments. *Love v. State*, 324 Ark. 526, 922 S.W.2d 701 (1996). Having failed to object to Dr. Peretti's testimony on evidence of oral sex before the trial court, Baldwin cannot raise the issue on appeal.

■ Even if Baldwin had objected to this testimony, it was not error for the trial court to allow it. Dr. Peretti testified that Michael Moore had injuries to the ears and the mouth and that he generally sees these types of injuries in children who are forced to perform oral sex. He also said that the injuries to the mouth could be caused by a punch or a slap. He noted that Steve Branch's injuries to his ears and mouth were similar to Michael Moore's, as were Christopher Byers's. Dr. Peretti, who was qualified to testify concerning the wounds of the victims and causation, testified that he generally saw the same types of wounds in child victims who were forced to perform oral sex. On cross-examination, he testified that the boys could have the external injuries, with no internal injuries or presence of sperm, and still have been forced to perform oral sex. He opined that if the oral sex was forceful enough to cause the bruises to the outside of the mouth, he would think that there would be bruising to the inside of the mouth as well. Dr. Peretti's qualification as a forensic pathologist was not questioned; therefore, any weaknesses in the bases for his opinions concerning oral sex, as they were developed on cross examination, would go to weight and credibility rather than admissibility. *Suggs, supra.*

Baldwin asserts that the trial court erred in allowing Dr. Peretti

to give his opinion that the sticks recovered from the crime scene were consistent with having caused some of the victims' wounds. Again, Baldwin argues that this testimony concerning the sticks was mere conjecture and speculation. Baldwin bases this argument on the fact that Dr. Peretti testified that the sticks could have caused the injuries, but a number of other objects could have caused them as well. Baldwin filed a motion in limine requesting that the State not be allowed to make any reference to the sticks without first laying an evidentiary foundation out of the hearing of the jury. He asserted that there was nothing to tie two of the sticks to the murders. At the hearing on the motions in limine, Baldwin made specific reference to allowing Dr. Peretti to testify that the injuries were consistent with having been caused by the sticks. The trial court denied the motion in limine regarding the sticks.

The State questioned Dr. Peretti regarding the various injuries to the victims and asked him whether the injuries to the victims' scalps that were consistent with being caused by an object the size of a broom handle could have been caused by one of the sticks that the State recovered from the crime scene. Dr. Peretti testified that the stick could have caused the injury. The State also asked whether the injuries caused by a larger blunt object could have been caused by the larger stick recovered by the State from the scene, and Dr. Peretti answered affirmatively. On cross-examination, Dr. Peretti testified that there were no wood fragments on the bodies of the victims. He also testified that he would expect to find wood fragments, unless they were washed off in the water. He testified that the injuries could have been caused by hundreds of items other than the sticks recovered at the scene.

It was not error for the trial court to allow Dr. Peretti's testimony. He testified in detail concerning the size, shape, and nature of the wounds and then opined that they could have been caused by the two sticks shown him by the State. Baldwin argues that Peretti gave an opinion based on mere conjecture and asserts that the foundation for an expert's opinion must not be nebulous. However, Dr. Peretti gave a thorough foundation for his opinion, which was not that the sticks caused the injuries, but that the wounds were consistent with being caused by the sticks. He also testified that the wounds could have been caused by other objects. It was for the jury to determine the weight and credibility to give his testimony concerning the sticks. *Suggs, supra.*

 Baldwin's final argument regarding Dr. Peretti's testimony is that the trial court erred in allowing Dr. Peretti to testify that some of the victims' wounds could have been caused by the knife recovered from behind Baldwin's house. The State responds that the argument is not preserved for appeal because Baldwin only objected to Dr. Peretti testifying that some of Steve Branch's injuries were consistent with having been caused by the State's knife. The State then asserts that even if the argument is preserved, the trial court should not be reversed. From the record, it appears that the State is correct that Baldwin only objected to Dr. Peretti testifying that the injuries to Steve Branch depicted in one photograph could have been caused by the knife found behind Baldwin's house and, therefore, waived any broader argument on this issue on appeal. However, it was not error for the trial court to allow Dr. Peretti's testimony regarding whether some of the wounds were consistent with having been caused by a knife of the type found behind Baldwin's house. He stated that pictures of Steve Branch's and Christopher Byers's wounds showed wounds consistent with having been caused by a knife with a serrated blade. He testified that he had previously examined the knife recovered from behind Baldwin's house and that he had examined the serrated pattern of some of the wounds that he found on all three victims. He testified as follows:

> Q. Okay. Did you find one pattern on the three victims that would be consistent with having been caused by a knife with that type of serrated pattern?

> A. There are injuries consistent with a type of serrated pattern.

On cross-examination, Dr. Peretti testified that he had never stated that the knife found behind Baldwin's house caused the injuries, but rather had said that a knife of that type was consistent with causing the injuries. He also explained the difference between the pattern left by knives with large serration and small serration, as well as the distortion in the pattern that is left, caused by the elasticity of the skin, the angle of the blade, and the reaction of the body that is being scraped. Dr. Peretti supported his opinion that some of the wounds were consistent with having been caused by the knife recovered behind Baldwin's house with a factual foundation. As previously discussed, he was qualified as an expert on forensic pathology, and there is no question that he was qualified to testify as

to the nature of the victims' wounds and the causes of the wounds. Any weaknesses in his opinion that some of the wounds were consistent with having been caused by the knife recovered from behind Baldwin's house went to weight and credibility, rather than admissibility. *See Suggs, supra.*

Echols argues that the trial court erred in overruling his objection to asking a leading question of Dr. Peretti. The question, which was on redirect, was as follows:

> Q. Okay. Now, Dr. Peretti, let me — Mr. Ford asked you about these weapons, if you could say positively that those weapons caused the injuries. And if I understand your testimony yesterday, there was one weapon used on these three boys that was a sharp object such as a knife, correct?
>
> A. That's correct.
>
> Mr. Ford [Baldwin's attorney]: I'm going to object to the leading. This is his witness. He is leading his witness in an effort to rehabilitate him.
>
> The Court: He is an expert witness. Go ahead. Overruled.
>
> Mr. Davidson [Echols's attorney]: We join in that objection.
>
> The Court: Overruled.
>
> Q. There was one weapon that was a sharp object such as a knife?
>
> A. That's right.

Even if the question were a leading one, an issue we need not decide, we would not reverse. Echols did not request a sanction or other relief when he objected. In *Perry v. State*, 277 Ark. 357, 642 S.W.2d 865 (1982), we wrote:

> The state's attorney asked a leading question and in effect testified. This was error but it was not prejudicial. Such matters are best handled by the trial court at the time of the improper statement or question. There was no request by the appellant to strike this testimony nor that the jury be admonished. Therefore, we will not consider it on appeal.

*Id.* at 374, 642 S.W.2d at 874. Similarly, even if the question here were a leading question, the error did not constitute reversible error.

Echols next argues that the trial judge commented on the evidence when he asked defense counsel, "[A]re you getting somewhere with something that is relevant?" and "You are going to assure me of that?" The argument came about as follows. One of Echols's attorneys was questioning Gary Gitchell, an inspector with the West Memphis Police Department. He attempted to show that the police department failed to conduct the investigation in a creditable manner. The questions were designed to show that the interviews with Echols should have been videotaped, that the photo line-up should have been recorded and conducted differently, that the evidence was not suitably collected and handled, that the tests on a knife were inadequate, and that the audio surveillance of Vickie Hutcheson's house was inappropriate. The attorney asked Gitchell whether he could find the permission slip allowing the department to set up the audio surveillance. Gitchell asked whether counsel wanted him to try to find it and counsel answered yes. At this point, the trial court asked the two questions about whether counsel was getting to something that was relevant. Echols's attorney answered in the affirmative, and the trial court said, "All right." After a bench conference, Echols's counsel asked Gitchell if he had found the permission slip. Gitchell answered no, and counsel asked if he would find it for them. Echols's direct examination stopped at that point.

The case of *Warren v. State*, 272 Ark. 231, 613 S.W.2d 97 (1981), is on point. There, the trial court did not know the defendant's theory of defense. During a series of questions by the defense attorney, the State objected. The trial court stated, "What's puzzling me is what difference does it make? I don't think it's relevant is what I'm saying." *Id.* at 235, 613 S.W.2d at 99. After an in-chambers conference, defense counsel was allowed to continue with his line of questioning. In affirming the lower court, we wrote:

> Article 7, § 23 of our constitution states that judges shall not "charge juries with regard to matters of fact" and so precludes them from commenting on the evidence. The judge is not to influence the jury with regard to the credibility of witnesses or the weight to be given their testimony. The prohibition applies not only to charges, but to colloquies

with lawyers in the jury's hearing. *Fuller v. State,* 217 Ark. 679, 232 S.W.2d 988 (1950). Clearly, if this inquiry into relevance could influence the jury in any manner, the case must be reversed, but since the appellant was allowed to pursue the line of questioning after the inquiry, we can see no possible inference on credibility, weight to be given, or any other matter. We hold the questioning into relevancy did not amount to a comment on the evidence.

*Id.* at 234, 613 S.W.2d at 99.

Echols also argues that the trial court's questions were in rebuke of counsel, and, for that reason, we should reverse. Our case of *Rogers v. State,* 257 Ark. 144, 515 S.W.2d 79 (1974), is on point on this argument. There, the prosecutrix in a rape case became upset during defense counsel's examination of her. Defense counsel stated to the court that the prosecutrix might need a few minutes to pull herself together. The trial court replied, "Well, you got her this way. Why don't you go ahead." *Id.* at 152, 515 S.W.2d at 184. Defense counsel moved for a mistrial, arguing that the trial court's remark was "highly prejudicial." *Id.* The trial court denied the motion. On appeal, we affirmed the conviction, and stated:

> Prejudicial error is not committed by the court's remark unless it constitutes an "unmerited rebuke" giving the jury the impression that defense counsel is being ridiculed. *Davis v. State,* 242 Ark. 43, 411 S.W.2d 531 (1967); *McAlister v. State,* 206 Ark. 998, 178 S.W.2d 67 (1944); *Jones v. State,* 166 Ark. 290, 265 S.W. 974 (1924). However, prejudice is not shown where the record reveals that the trial judge was merely irritated at defense counsel's trial tactics. *Walker v. Bishop,* 408 F.2d 1378 (8th Cir. 1969). Although the better practice, as we have often said, is to talk to counsel out of the jury's hearing, we do not construe this remark as ridiculing the appellant's counsel. The court merely was stating the obvious. By terse questioning on cross-examination, the defense counsel was properly attempting to weaken the prosecutrix's testimony as a witness. The court's remark certainly did not relate to the merits of the case. At most, it could only be construed as a mere irritation which "does not constitute reversible error whether the court's irritation was justified or not." *Walker v. Bishop, supra.*

*Id.* at 152-53, 515 S.W.2d at 84-85.

■ In the present case, the trial judge asked about the relevancy of the continued questioning and seemed to be irritated with counsel's tactics. Even so, the questions did not constitute an unmerited rebuke of the attorney.

■ Baldwin argues that the trial court erred when it denied his request to cross-examine Michael Carson about drug and alcohol use. Michael Carson, who had been in juvenile detention with Baldwin, was called to testify that Baldwin told him he had killed the three boys, sucked blood from Chris Byers, and put Byers's testicles in his mouth. Carson also testified that Baldwin told him he was going to "kick Jessie Misskelley's ass" because he had "messed everything up." Baldwin sought to impeach Carson's credibility by asking him about a medical diagnosis that he was "LSD dependent, marijuana dependent, and alcohol dependent." Baldwin did not make an offer of proof, and we could affirm this point on that basis. *See* Ark. R. Evid. 103(a)(2). However, counsel made extensive argument and obviously intended part of the argument to be a proffer. Baldwin argued to the trial court, without any factual statement, that the chemical dependency affected Carson's ability to distinguish between reality and fantasy. The trial court refused to allow the questioning, and stated that Ark. R. Evid. 608 would allow impeachment with his juvenile adjudications, which Baldwin had already been allowed to do, but the court was "bothered by [the] desire to cross-examine him with regard to specific acts of misconduct involving drugs that may or may not affect his ability to recall." On appeal, Baldwin contends the ruling was in violation of Ark. R. Evid. 608 and the Confrontation Clause of the United States Constitution. He did not make the Confrontation Clause argument to the trial court; therefore, we do not consider it on appeal. Even constitutional arguments are waived when they are not presented to the trial court. *Martin* v. *State*, 316 Ark. 715, 875 S.W.2d 81 (1994).

■■ Rule 608 of the Arkansas Rules of Evidence provides that a witness may be cross-examined with specific instances of conduct, if probative of the witness's character for truthfulness. The rule limits the inquiry on cross-examination to specific instances of conduct clearly probative of truthfulness or untruthfulness. *Rhodes* v. *State*, 276 Ark. 203, 634 S.W.2d 107 (1982). There was no showing that substance abuse relates to truthfulness or un-

truthfulness. Further, it does not appear that Baldwin was attempting to show that Carson was on drugs or intoxicated when he heard the statement. In fact, it was most likely impossible for him to show such facts, since Carson was in a juvenile detention facility when he heard Baldwin make the statement, and he had been for some time when he heard the statement. Although the medical diagnosis has not been abstracted, the questions and statements of the trial court indicate there was nothing in it to show that substance abuse had affected Carson's perception of reality, or his ability to tell the truth. Finally, the trial court asked Baldwin's attorney if he had a good-faith basis for the questions, and counsel never responded with any fact indicating that the alleged substance abuse went to truthfulness or untruthfulness. The trial court applied the proper tests, which are: (1) whether the question is asked in good faith; (2) whether the probative value outweighs the possibility of unfair prejudice; (3) whether it relates to the witness's truthfulness. *Mackey* v. *State*, 279 Ark. 307, 651 S.W.2d 82 (1983). Under these circumstances, we cannot say that the trial court abused its discretion in finding that the evidence was not clearly probative of veracity and, as such, would have been unfairly prejudicial. *See Maples* v. *State*, 16 Ark. App. 175, 698 S.W.2d 807 (1985).

Echols's next argument is that the trial court erred in allowing the State to make two cuts in a grapefruit during closing argument. The prosecuting attorney made one cut in a grapefruit with the serrated knife that the State recovered from behind Baldwin's residence, and then made another cut with the knife that defense counsel implied was used to cut the victims. The second knife had a regular blade. The prosecuting attorney compared the cuts in arguing that the cuts on Byers were like those made by the knife the State had introduced.

This point is governed by *Hill* v. *State*, 289 Ark. 387, 713 S.W.2d 233 (1986). There, the appellant argued that the trial court erred in refusing to grant a mistrial or a new trial because the prosecutor argued outside the record and presented evidence not in the record. During his closing argument in the penalty phase, the prosecutor picked up a shotgun that was in evidence and loaded it with five shells in order to show that the gun only held five shells and to argue that the defendant had reloaded his gun after firing two shots at officers. The defendant made a general objection at trial and argued on appeal that there was no proof that the murder

weapon in the case held only five shells and that the prosecutor had picked up the wrong gun. In affirming the trial court, we stated:

> Demonstrations such as the one performed by the prosecutor are permissible. We have allowed prosecutors to use items such as clothing, rope or documents by way of illustration in their closing arguments for many years. *See Derrick* v. *State*, 92 Ark. 237, 122 S.W. 506 (1909); *Tiner* v. *State*, 109 Ark. 138, 158 S.W. 1087 (1913). Some leeway is given in closing remarks and counsel are free to argue every plausible inference which can be drawn from the testimony. *Abraham* v. *State*, 274 Ark. 506, 625 S.W.2d 518 (1981). Nevertheless, "[c]losing arguments must be confined to questions in issue, the evidence introduced and all reasonable inferences and deductions which can be drawn therefrom." *Williams* v. *State*, 259 Ark. 667, 535 S.W.2d 842 (1976). The trial court has a wide latitude of discretion in controlling the arguments of counsel and its rulings in that regard are not overturned in the absence of clear abuse. *McCroskey v. State*, 271 Ark. 207, 608 S.W.2d 7 (1980).
>
> Other states have found permissible closing argument where a prosecutor used "similar" material to a rope used to bind a victim to show that the victim might have bound himself, *Collins* v. *State*, 561 P.2d 1373 (Okla. Cr. 1977); where a live model and an unloaded pistol were used to demonstrate that shots could not have been fired in the manner claimed by the defendant, *Herron* v. *Commonwealth*, 23 K.L.R. 782, 64 S.W. 432 (1901); where a piece of crayon was used to show how the defective muzzle on a revolver could have deformed a bullet fired from the pistol, *Russell* v. *State*, 66 Neb. 497, 92 N.W. 751 (1902); where an attorney borrowed a gun from an officer in the courtroom to demonstrate the deceased could not have inflicted a fatal wound upon herself, *Peoples* v. *Commonwealth*, 147 Va. 692, 137 S.E. 603 (1927); and where a toy gun was used to prove the fatal wound could not have been inflicted as claimed, *Barber* v. *Commonwealth*, 206 Va. 241, 142 S.E.2d 484 (1965). In the *Barber* case the Virginia court found it was within the sound discretion of the trial court to determine whether the use of the toy pistol should be permitted even though the toy was not shown to be the same size or type as the murder weapon.

> Likewise, here the trial judge did not abuse his discretion when he permitted the prosecutor's demonstration with the shotgun.

*Id.* at 393-94, 713 S.W.2d at 236. Comparably, in the case now before us, the trial court did not abuse its discretion in allowing the prosecutor in closing argument to compare the cuts made by the two knives.

Echols next argues that the trial court erred when it overruled his objection to a question asked Deanna Holcomb. This argument comes about as follows. During the State's case-in-chief, Holcomb, who was Echols's former girlfriend, testified that she had seen Echols with a knife similar to the one found behind Baldwin's residence. The deputy prosecuting attorney asked her if Echols told her why he carried such a knife. Echols made a general objection, which the trial court overruled. Holcomb answered that Echols told her he carried the knife because he did not feel safe.

We have written that a general objection which was overruled cannot avail upon appeal unless there was no reason whatsoever to admit the evidence, because the trial judge had no way of knowing what was in counsel's mind. *Swanson* v. *State*, 308 Ark. 28, 823 S.W.2d 812 (1992) (quoting *United States* v. *Klein*, 488 F.2d 481 (2d Cir. 1973)). On appeal, Echols argues that the ruling was in violation of Ark. R. Evid. 404(b), but he did not advance such an argument to the trial court. It is settled that a party cannot raise an issue for the first time on appeal. *Id.* Even if it could be said that the trial court should have sustained the objection under 404(b) or for any other reason, we would not reverse, because the alleged error could not have had a substantial effect on the rights of the defendant. *Daniels* v. *State*, 293 Ark. 422, 739 S.W.2d 135 (1987). Here, there was already ample evidence that Echols owned knives, and Holcomb did not testify that Echols used the knife, only that he carried it because he did not feel safe.

The next argument comes about as follows. Echols testified in his own defense in the guilt-innocence phase of the trial. On cross-examination, the deputy prosecuting attorney asked him if he knew of any reason why the two witnesses might have fabricated the statements that they overheard him say he committed the murders. Echols objected on the ground that the question shifted the burden of proof. The trial court said that it was going to allow the prosecu-

tor to ask Echols, "maybe not in the form you asked him . . . if he knows of any reason why they would have some bias or prejudice against him." The prosecutor then asked Echols why the two witnesses would take the stand and fabricate a story about him.

Echols assigns the trial court's ruling as error. We disagree. The question did not change the burden of proof, and Echols did not ask for a limiting instruction on the matter. The question was designed to compare Echols's credibility to that of the two State witnesses, and that was appropriate. We have often held that when a defendant takes the stand in a criminal case, his credibility becomes an issue. *Thomas v. State*, 315 Ark. 518, 868 S.W.2d 85 (1994).

Also during cross-examination, the State questioned Echols about his manic-depressive illness, and whether it led to an incident in which he tried to claw the eyes out of a student. After a lengthy bench conference, the trial court ruled that it was going to allow the prosecutor to ask Echols if he had extreme mood swings, but that Echols could not be asked about specific instances of conduct unless they were in close proximity to the crimes for which he was on trial. The State did not ask anything more about the incident in which Echols tried to claw the eyes out of a student. The prosecutor changed focus and asked if Echols had an altercation with his father while they were in Oregon, and if it resulted in his immediate return to Arkansas. The trial court ruled that the question was proper to rebut Echols's testimony that he became violent only toward himself, but not toward other people. The trial court noted that the incident occurred within eight or nine months of the crimes for which Echols was on trial. Echols testified that he had locked himself in his room in Oregon, threatened to commit suicide, was placed in a hospital, and, when his father came to visit him, told his father that he would eat him alive. As a result, he was immediately sent back to Arkansas. Echols argues on appeal that the trial court erroneously allowed evidence of bad character when he had not put his character at issue.

The prosecutor's questions on cross-examination had independent relevance about Echols's medication, mood swings, knife collection, and quick return from Oregon. Further, when Echols responded on cross-examination that he did not become violent toward others when he was off his medication, the prosecutor properly brought up the incident with his father to impeach his truthfulness. While there are matters that cannot be used against an

accused solely because he is a *defendant*, these same matters can be used against an accused when he becomes a *witness*. 3A John Henry Wigmore, *Evidence in Trials at Common Law* § 889 (Chadbourn rev. ed. 1976 & Supp. 1991). A witness always puts his credibility at issue when he takes the stand. *McDaniel v. State*, 291 Ark. 596, 726 S.W.2d 679 (1986). Here, the question was logically related to matters Echols had brought up himself — his manic-depressive illness and his immediate return to Arkansas. *See Shaver v. State*, 37 Ark. App. 400, 830 S.W.2d 364 (1994).

Echols and Baldwin, in their next argument involving evidentiary rulings, contend that the trial court erred in allowing the State to call Dr. Duke Jennings, a pathologist, to testify about the time of the deaths. The argument comes about as follows. Dr. Peretti, the forensic pathologist first called by the State, testified on direct examination that "I did not deal with the issue of time of death or mention that in my autopsy report." However, on cross-examination, he testified that, based upon what he knew about the case, and the rigor mortis of the bodies, the time of the deaths was between 1:00 a.m. and 5:00 a.m. on May 6, 1993. This was different from the testimony he had given on direct and different from the testimony he gave in the Misskelley trial, and the testimony was a surprise to the State. On redirect by the State, he noted that rigor mortis can be delayed by cool temperatures, such as from being immersed in cool water for twenty-four to thirty-six hours.

Five days later, but before the State rested its case-in-chief, the deputy prosecutor notified counsel for appellants that the State would call another pathologist, Dr. Duke Jennings, to testify about the time of the deaths. At that time, at a bench conference, appellants objected on the ground that the State had not provided the name of Dr. Jennings as a witness. The deputy prosecutor responded that the State had not anticipated calling Dr. Jennings because it had no reason to think that Dr. Peretti would change his testimony from that he gave in the Misskelley trial. The trial court ruled: "I do not know how you could anticipate a witness that previously testified as to the same facts and circumstances would change his testimony. It seems unfair." The trial court said that it would allow Dr. Jennings to testify about the time of the deaths.

During the State's rebuttal evidence, the State called Dr. Jennings to testify about the time of death. Appellants' counsel asked the court whether the State was being allowed to reopen its case or

if Dr. Jennings was a rebuttal witness. The trial court responded that it did not matter because it was discretionary with the court. Dr. Jennings testified that, based upon the information provided, there was no basis for a meaningful estimate as to the time of death. Both appellants assign as error the ruling allowing Dr. Jennings to testify.

The ruling of the trial court was correct. The State could not anticipate that Dr. Peretti would change his testimony and on cross-examination, give testimony that, when coupled with other evidence, would imply that Echols could not have committed the murders because he was at home asleep at the time of the victims' deaths. Thus, Dr. Jennings's testimony that it was impossible to estimate the time of death was in direct response to the unexpected estimate of time given by Dr. Peretti on cross-examination. Since the testimony was in response to testimony elicited by the defense, it was genuine rebuttal evidence, and the name of the witness did not have to be disclosed. *Schalski* v. *State*, 322 Ark. 63, 67-68, 907 S.W.2d 693, 696 (1995).

Baldwin and Echols both insist that the trial court erred in allowing into evidence the knife with a serrated blade. A diver found the knife in a lake behind the Baldwin residence on November 17, 1993. It was found forty-seven feet from the edge of the water and in line with the Baldwin's property line. There is a fishing pier directly behind the Baldwin mobile home, and the knife was found sticking blade-down in mud at the lake's bottom, thirty-five feet straight out from the pier. The knife was large and had a serrated edge, and it had the words "Special Forces Survival Roman Numeral Two" on the blade. Dr. Frank Peretti testified that numerous wounds found on the victims were made by a serrated blade and were consistent with, and could have been caused by, such a knife.

Deanna Holcomb, who was Echols's girlfriend in 1991, testified that she had seen him carrying a knife similar to that one, except that it had a compass on the end. James Parker, owner of Parker's Knife Collector Service in Chattanooga, Tennessee, testified that another knife company he had worked for distributed this type of knife from 1985-87. Through Parker's testimony, the trial court admitted a 1987 catalog from the other company, which contained a picture of a knife like the one found. That knife had a compass on the end, and it had the words "Special Forces Survival Roman Numeral Two."

When the State sought to have the knife admitted, both appellants objected on the ground that there was nothing connecting it to the crimes, such as blood, fingerprints, or tissue, and it was not connected to the crime scene. The trial court overruled the objections and stated that there were enough circumstantial links to allow its admission.

 The argument is one of relevance, and a trial court has discretion in determining relevance. *Miller* v. *State*, 280 Ark. 551, 660 S.W.2d 163 (1983). A trial court's ruling on relevance will be reversed only for abuse of discretion. *Dixon v. State*, 311 Ark. 613, 846 S.W.2d 170 (1993). "When evidence on an issue is circumstantial, it is never irrelevant to put in evidence any circumstance which may make the proposition at issue more or less probable." *Grigsby* v. *State*, 260 Ark. 499, 506, 542 S.W.2d 275, 279 (1976). The State offered testimony that the knife was like the one Echols carried, that it was found forty-seven feet behind Baldwin's residence, and that it could have caused the injuries. The evidence provided a link to the crimes and made appellants' identities more probable than without the evidence. *Miller* v. *State, supra; see also Fountain* v. *State*, 275 Ark. 457, 620 S.W.2d 936 (1981); Ark. R. Evid. 401. Thus, the trial court did not abuse its discretion in admitting the knife.

Echols's and Baldwin's ensuing argument is that the trial court erred in admitting into evidence the two sticks that were found near the bodies of the victims. Police officers found one of the sticks stuck in the creek bed near the victims. It had a shirt belonging to one of the victims wrapped on the end that was out of the water. This is the larger of the two sticks. This stick appeared in the photographs of the scene, which were admitted without objection, but it was not retrieved by Detective Ridge until Misskelley described the crimes. The smaller stick was found floating in the creek near the bodies and was retrieved during the initial crime-scene search.

Appellants both objected to the introduction of the sticks on the ground that there was no physical evidence that either of them was used as a murder weapon. The trial court overruled the objection and stated that they were relevant and admissible because one of the sticks was jabbed down in the water and had the shirt wrapped around it, the other was found near the bodies, one contained carving, and both had distinguishing marks because it

appeared that someone had removed the bark. The court noted that the medical examiner testified that the victims' head injuries were consistent with blunt trauma similar to that which would have been caused by sticks like these.

■ Again, the trial court did not abuse its discretion. *See Dixon* v. *State,* 311 Ark. 613, 846 S.W.2d 170 (1993). The reasons given by the trial court are sufficient to support its ruling on relevance.

Echols argues that the trial court erred when it denied his motion for a mistrial because of a statement that was made during his cross-examination of Officer Bryn Ridge. Echols's counsel asked Ridge about the crime scene and the stick found there with one of the victim's shirts wrapped around the end of it. His testimony revealed that the police left the stick at the scene, but retrieved it on July 1, 1993, after Jessie Misskelley gave his statement to police. When Echols's attorney asked him about the stick, he said, "No, sir, I did not take this stick into evidence until Misskelley's statement in which he said …." Echols objected and asked for a mistrial because Ridge had "blurted out" that Misskelley confessed. The motion for a mistrial was denied, but the court instructed the jury to ignore the statement. Echols now contends that the trial court erred by refusing to grant a mistrial.

■ In *Patrick* v. *State,* 314 Ark. 285, 862 S.W.2d 239 (1993), we held that an admonition was sufficient to cure any possible prejudice that resulted from an inadvertent reference to a codefendant's plea of guilty. There, the response was to a prosecutor's good-faith question. Here, Echols's counsel asked the question, so good faith is not at issue. Instead, the only question is whether the trial court abused its discretion in ruling that the admonition cured any possible harm. *See id.* at 288, 862 S.W.2d at 241. Echols has made neither a showing nor a convincing argument that the trial court abused its discretion in finding that the admonition was sufficient. We have often said that a mistrial is an extreme remedy that should only be granted when justice cannot be served by continuing the trial. *Bennett* v. *State,* 297 Ark. 115, 759 S.W.2d 799 (1988).

### Instruction Arguments

■ Both Echols and Baldwin objected to the trial court giving the accomplice instruction. AMI Crim. 3d 401 (Accom-

plice). They contend that there was no testimony that placed them together on the day of the crime, and, since the jury was instructed to consider the evidence against each defendant separately, an accomplice instruction was precluded. The trial court correctly gave the instruction because there was evidence from which the jury could reasonably find that both defendants said they killed the children; fibers from clothing found in both defendants' homes were similar to fibers found on the victims' clothing; the description of the person identified as Domini Teer, who was seen with Echols the night of the murders, also fit the description of Baldwin, who was also very thin and had long hair; Echols and Baldwin were best friends and spent two or three hours together a day; a knife similar to one Echols had owned was found near Baldwin's residence; sticks similar to the ones both had been seen carrying previously were found at the scene; two different types of knots were used to tie the victims; there were three victims, and there was sufficient evidence from which a jury could have concluded that the murders were not committed by one person. We have said that if there is some evidence to support an instruction, it is appropriate for a trial court to give it. *Mitchell* v. *State*, 306 Ark. 464, 862 S.W.2d 254 (1993).

### Capital Punishment Arguments

Echols asks us to reconsider our holding in *Wilson* v. *State*, 271 Ark. 682, 611 S.W.2d 739 (1981), and to declare the death penalty to be cruel and unusual punishment. We adhere to our prior holdings. In *Sheridan* v. *State*, 313 Ark. 23, 852 S.W.2d 772 (1993), we rejected the defendant's argument that the death penalty was cruel and unusual punishment and stated that both this court and the United States Supreme Court have held that the death penalty is not cruel and unusual punishment. In *Wilson* v. *State*, the case referred to by Echols, we rejected the defendant's argument that life without parole was cruel and unusual punishment and stated that it has long been this court's holding that sentencing within the statutory limits is not cruel and unusual punishment.

Echols's next argument involves the statutory overlap between the elements of capital murder and first-degree murder. In this argument his initial predicate is that there is no clear difference between the elements of capital murder, Ark. Code Ann. § 5-10-101 (Repl. 1993), and the elements of first-degree murder, Ark.

Code Ann. § 5-10-102 (Repl. 1993). His next step in the argument is to state that the prosecutor has discretion in choosing whether to file a capital murder charge or a first-degree murder charge, and, if capital murder is charged, the jury is then left to speculate about the degree of offense to which it should affix a finding of guilt. The final step in the argument is that it is not until the penalty phase of the trial, after the jury has already determined the defendant to be guilty of capital murder, that the jury considers aggravating or mitigating circumstances. We have already answered this argument, and we adhere to our prior holding.

In *Nooner v. State,* 322 Ark. 87, 907 S.W.2d 677 (1995), we said:

> Nooner raises the spectre of unconstitutional overlapping between our capital murder statute and first degree murder statute in that the two statutes blur and proscribe the same conduct. According to his theory, the statutes do not give proper notice of the criminal offenses and are void for vagueness. This court has discounted this argument on numerous occasions. *See, e.g., Greene v. State,* 317 Ark. 350, 878 S.W.2d 384 (1994); *Sanders v. State,* 317 Ark. 328, 878 S.W.2d 391 (1994); *Buchanan v. State,* 315 Ark. 227, 866 S.W.2d 395 (1993); *Mauppin v. State,* 309 Ark. 235, 831 S.W.2d 104 (1992); *Van Pelt v. State,* 306 Ark. 624, 816 S.W.2d 607 (1991); *Smith v. State,* 306 Ark. 483, 815 S.W.2d 922 (1991).

*Id.* at 105-06, 907 S.W.2d at 687. In *Nooner,* this court also explained that it was acceptable for the jury to not consider aggravating and mitigating circumstances until the penalty phase of the trial. The court stated:

> Nooner argues that the definition of capital murder does not sufficiently narrow the crime for which the death penalty can be imposed. He specifically alludes to overlap between definitions of capital murder and first degree murder, which we have already discussed. The United States Supreme Court has held that the required narrowing of crimes susceptible to the death penalty may occur at the penalty phase of the trial. *Lowenfield v. Phelps,* 484 U.S. 231, 108 S. Ct. 546, 98 L. Ed. 568 (1988). This court has previously held that our statutes pass the narrowing requirement

by limiting the death penalty to crimes involving sufficient aggravating circumstances. *See Sheridan* v. *State, supra.* There is no merit to Nooner's contention.

*Id.* at 107, 907 S.W.2d at 687-88.

In Echols's next point, he initially states that Ark. Code Ann. § 5-4-603 (Repl. 1993), requires the jury to impose the death sentence if it unanimously returns certain written findings. From that predicate he argues that the instruction quoting the statute is binding, and a binding instruction is unlawful. Finally, he asserts that if the statute were declared unconstitutional, there would be no need to qualify a jury for the death penalty. Again, the argument is without merit.

Section 5-4-603 of the Arkansas Code Annotated provides in pertinent part:

(a) The jury shall impose a sentence of death if it unanimously returns written findings that:

(1) Aggravating circumstances exist beyond a reasonable doubt; and

(2) Aggravating circumstances outweigh beyond a reasonable doubt all mitigating circumstances found to exist; and

(3) Aggravating circumstances justify a sentence of death beyond a reasonable doubt.

(b) The jury shall impose a sentence of life imprisonment without parole if it finds that:

(1) Aggravating circumstances do not exist beyond a reasonable doubt; or

(2) Aggravating circumstances do not outweigh beyond a reasonable doubt all mitigating circumstances found to exist; or

(3) Aggravating circumstances do not justify a sentence of death beyond a reasonable doubt.

Ark. Code Ann. § 5-4-603(a) & (b) (Repl. 1993).

In *Hill* v. *State,* 289 Ark. 387, 713 S.W.2d 233 (1986), *cert. denied,* 479 U.S. 1101 (1987), we held that Ark. Code Ann.

§ 5-4-603 does not require a mandatory death sentence, but rather provides specified criteria that must be fully satisfied before the death sentence can be imposed. More recently, in *Nooner* v. *State*, 322 Ark. 87, 907 S.W.2d 677 (1995), we held:

> Nooner maintains that our sentencing statutes demand a death sentence and eliminate consideration of mercy by the jury. *See* Ark. Code Ann. § 5-4-603 (Repl. 1993). We have previously held that this is not the case. *See Cox* v. *State*, 313 Ark. 184, 853 S.W.2d 266 (1993); *Sheridan* v. *State*, 313 Ark. 23, 852 S.W.2d 772 (1993); *Henderson* v. *State*, 311 Ark. 398, 844 S.W.2d 360 (1993); *Johnson* v. *State*, *supra*. We have underscored that our statute provides that a jury is free to sentence to life without parole if it finds the aggravating circumstances do not "justify" death. *See* Ark. Code Ann. § 5-4-603(b)(3) (Repl. 1993). There was no error on this point.

*Id.* at 106-07, 907 S.W.2d at 687. The wording of Ark. Code Ann. § 5-4-603 and our case law applying the statute make it clear that the statute does not contain a binding instruction. Consequently, the trial court did not err in denying Echols's motion to declare Ark. Code Ann. § 5-4-603 unconstitutional.

Echols contends that Ark. Code Ann. § 5-4-604(8) (Supp. 1995) is unconstitutionally vague because it provides that the jury can find an aggravating circumstance upon a finding that a murder was committed in an "especially cruel or depraved manner." In his argument, he first notes that the prior statute, which provided that the jury could consider the "heinous, atrocious or cruel" nature of the crime was struck down by this court in *Wilson* v. *State*, 295 Ark. 683, 751 S.W.2d 734 (1988) as being overbroad because it did not provide a clear standard to distinguish between ordinary and "especially cruel" capital murders. He then states that we have not reviewed the statute since it was amended, and that the "cruel and depraved" language does not provide a genuine narrowing of the types of persons deserving a life sentence from those eligible for the death penalty. In addition to arguing that the statute is unconstitutional on its face, Echols argues that it is unconstitutional as applied to him because "there is insufficient evidence that he inflicted serious physical abuse or did so for a considerable period of time" before killing the three boys, and that there "is insufficient evidence that establishes that Echols intended to inflict mental anguish or did

so prior to any killing."

Pursuant to Ark. Code Ann. § 5-4-603, the death penalty cannot be imposed unless the State can prove the existence of an aggravating circumstance. In the present case, the jury found the aggravating circumstance that the murders were committed in an especially cruel or depraved manner. Section 5-4-604 provides the following regarding "an especially cruel or depraved manner":

> Aggravating circumstances shall be limited to the following:
>
> . . . .
>
> (8)(A) The capital murder was committed in an especially cruel or depraved manner.
>
> (B) For purposes of this subdivision (8), a capital murder is committed in an especially cruel manner when, as part of a course of conduct intended to inflict mental anguish, serious physical abuse, or torture upon the victim prior to the victim's death, mental anguish, serious physical abuse, or torture is inflicted. "Mental anguish" is defined as the victim's uncertainty as to his ultimate fate. "Serious physical abuse" is defined as physical abuse that creates a substantial risk of death or that causes protracted impairment of health, or loss or protracted impairment of the function of any bodily member or organ. "Torture" is defined as the infliction of extreme physical pain for a prolonged period of time prior to the victim's death.
>
> (C) For purposes of this subdivision (8), a capital murder is committed in an especially depraved manner when the person relishes the murder, evidencing debasement or perversion, or shows an indifference to the suffering of the victim and evidences a sense of pleasure in committing the murder.

Ark. Code Ann. § 5-4-604(8) (Supp. 1995).

In *Willett* v. *State*, 322 Ark. 613, 911 S.W.2d 937 (1995), we addressed the defendant's argument that the statutory definition of the aggravating circumstance of "especially cruel or depraved" was void for vagueness on its face and as applied to him. The defendant claimed that the definitions did not provide clear and objective standards to the jury. We rejected the arguments and

held:

> The General Assembly rewrote this aggravating circumstance in Act 683 of 1991 after this court declared in *Wilson v. State*, 295 Ark. 682, 751 S.W.2d 734 (1988), that its statutory predecessor was unconstitutional in violation of the Eighth and Fourteenth Amendments to the federal constitution. The 1991 statutory amendment includes language substantially similar, if not identical, to language upheld as constitutional by the United States Supreme Court in *Walton v. Arizona*, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990). *Greene*, 317 Ark. 350, 878 S.W.2d 384. For the reasons stated by the Supreme Court in *Walton*, our statute is therefore not void on its face.

*Id.* at 629, 911 S.W.2d at 945. *See also Johnson v. State*, 326 Ark. 430, 934 S.W.2d 179 (1996). Thus, the trial court correctly denied Echols's motion to hold Ark. Code Ann. § 5-4-604(8) unconstitutional.

 Moreover, the statute is not unconstitutional as applied to Echols. In the present case, the jury was instructed on cruel and depraved manner as follows:

> For definition purposes, cruel manner is defined: A capital murder is in an especially cruel manner when as a part of a course of conduct intended to inflict mental anguish, serious physical abuse or torture upon the victim prior to the victim's death, mental anguish, serious physical abuse or torture is inflicted.

> Mental anguish is defined as the victim's uncertainty as to his ultimate fate.

> Serious physical abuse is defined as physical abuse that creates a substantial risk of death or that causes protracted impairment of health or loss or protracted impairment of the function of any bodily member or organ.

> Torture is defined as the infliction of extreme physical pain for a prolonged period of time prior to the victim's death.

> Depraved manner is defined as a capital murder is committed in an especially depraved manner when the person

relishes the murder, evidencing debasement or perversion or shows an indifference to the suffering of the victim and evidences a sense of pleasure in committing the murder.

There was substantial evidence to support the jury's determination that the murders were committed in an especially cruel or depraved manner. At least one of the victims had defensive wounds. The autopsy revealed that two of the victims died by drowning, but that their head wounds were so severe that they would have died from them if they had not drowned. There was evidence that these two victims were tortured before they drowned. The third victim bled to death.

Echols contends that the death penalty imposed on him is out of proportion to his conduct and is, therefore, cruel and unusual punishment under the Eighth Amendment. He argues that a proportionality review is a requirement under Arkansas law and that his death sentence should be compared to other death sentences in Arkansas and, in particular, to Baldwin's sentence to life without parole. He contends that we might infer aggravating circumstances from the nature and extent of the wounds, but argues that mitigating circumstances outweigh aggravating circumstances. Finally, in this argument, he contends that when his death sentence is compared to the life sentences of Baldwin and Misskelley, the death sentence was "freakishly and arbitrarily applied."

In *Willett* v. *State*, 322 Ark. 613, 911 S.W.2d 937 (1995), we stated that we would no longer conduct proportionality reviews of death sentences and cited *Williams* v. *State*, 321 Ark. 344, 902 S.W.2d 767 (1995), for the reasons. In *Williams*, we wrote:

> The state has asked this court to conduct a proportionality review which we have done in the past. *See Sanders* v. *State*, 317 Ark. 328, 878 S.W.2d 391 (1994); *Parker* v. *State*, 300 Ark. 360, 779 S.W.2d 156 (1989); *Hill* v. *State*, 289 Ark. 387, 713 S.W.2d 233 (1986). Comparative proportionality review is not constitutionally mandated in every case where the death sentence is imposed. *Pulley v. Harris*, 465 U.S. 37, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984). Our Legislature, by enacting recent sentencing procedures, has provided a statutory check on arbitrariness by requiring a bifurcated proceeding where the jury is provided with information on aggravating and mitigating circumstances, and with standards

> in the use of that information. *See* Ark. Code Ann. §§ 5-4-103, 5-4-603 — 605 (Repl. 1993). Additionally, our review upon appeal includes a review of the aggravating and mitigating circumstances presented to the jury and a harmless error review of the jury's findings. *See* § 5-4-603.

*Id.* at 352-53, 896 S.W.2d at 772.

### Miscellaneous Arguments

Echols states that at the time he filed his brief, the State had not paid his attorneys. He argues that the State's failure to pay his attorneys violates his right to counsel, due process, and equal protection. Consequently, he contends, his capital murder convictions and death sentences should be reversed and remanded or dismissed. In his argument, he incorporates by reference *State* v. *Crittenden County*, 320 Ark. 356, 896 S.W.2d 881 (1995), which concerns the payment of attorneys' fees in this case. Echols does not support his argument with any citation of authority or convincing argument that his conviction should be reversed for failure by the State to pay attorneys' fees by the time his brief was filed. We could summarily dismiss the point for failure to cite authority, or make a convincing argument. In *Williams* v. *State*, 325 Ark. 432, 930 S.W.2d 297 (1996), we held:

> We do not reach the merits of many of these arguments because they are all essentially one-sentence assertions with no citation to supporting authority and without explanation as to how the cited portions of the constitutions have been violated. We do not consider an argument, even a constitutional one, when the appellant presents no citation to authority or convincing argument in its support, and it is not apparent without further research that the argument is well-taken. *Roberts* v. *State*, 324 Ark. 68, 919 S.W.2d 192 (1996).

*Id.* at 439, 930 S.W.2d at 300-01.

However, the penalty in this case is death, and we prefer to reach the merits of the argument. In *Patterson* v. *State*, 306 Ark. 385, 815 S.W.2d 377 (1991), the defendant contended on appeal that the "fee cap" statute limiting the amount paid to his appointed counsel was unconstitutional. We explained that we had previously held that the statute limiting the amount of fees that can be paid to attorneys appointed to represent indigent defendants was

unconstitutional. We then held that we would not reverse a conviction on the basis of the constitutional inadequacy of the attorney's fee absent a showing that the defendant was prejudiced by the inadequacy of the fee. Here, there was no showing that Echols was prejudiced in any manner by the State's failure to pay his attorneys' fees by the time he filed his brief in this court.

 Echols and Baldwin next argue that the trial court committed cumulative reversible error. However, neither has preserved a cumulative-error argument because neither argued the issue to the trial court. *Witherspoon v. State*, 319 Ark. 313, 891 S.W.2d 371 (1995). Baldwin concedes in his reply brief that he did not make the required objection. Echols's arguments center around various comments made by the trial court. Because of the sentences in these cases, it has been necessary to make a review of all rulings adverse to appellants, and we note that Echols did not object to any of the individual comments he complains about in this point. Even under Rule 4-3(h) of the Supreme Court, we do not employ the plain-error rule. *Childress v. State*, 322 Ark. 127, 907 S.W.2d 718 (1995).

Baldwin next argues that the trial court committed error by having contact with the jury, and erred in refusing to grant a mistrial. The situation here came about as follows. After the guilt phase of the trial was completed, but before the penalty phase had begun, Echols's attorneys learned that the jury foreman's daughter had received a death threat. They also learned that another juror had received a threatening phone call.

The trial judge stated that he was aware of the call to a juror because she had told him about it. The judge stated that he asked the juror if the call would affect her in any way, if she wanted to be excused from the jury, and if she wanted a monitor installed on her phone. She answered "no" to all. The judge stated that he questioned the foreman, who responded that neither he nor his family had received a direct threat but that there was something "indirect" that had happened. The judge did not to ask him to be more specific. The foreman said he had had about a "ten second" discussion with the other jurors about the "indirect" matter, but that it was not brought up during deliberations and was never mentioned again. He said it did not affect his ability to render a fair and impartial verdict.

After the penalty phase and in the presence of counsel, the trial court questioned the juror, who confirmed that she had received a prank call, had reported it to the court, and had told the court it would not affect her deliberations. Another juror verified that the court had instructed the entire jury to notify him or the bailiff if they should be threatened in any way. The court then polled the jury, and each juror stated that their deliberations had not been affected, that these things had not been discussed during deliberations, and that no other threats had been discussed during deliberations.

█ Baldwin contends that the trial court erred by having contact with the jury and not granting a mistrial. We have often written that a mistrial is an extreme remedy that should only be granted when justice cannot be served by continuing the trial. *Bullock* v. *State*, 317 Ark. 204, 876 S.W.2d 579 (1994). A trial court's exercise of discretion will only be reversed when it is abused. *Stanley* v. *State*, 317 Ark. 32, 875 S.W.2d 493 (1994). In matters involving impartiality of jurors, we have consistently deferred to the trial court's opportunity to observe jurors and gauge their answers in determining whether their impartiality was affected. *Holland* v. *State*, 288 Ark. 435, 706 S.W.2d 375 (1986). When the record reflects that the trial court received assurance from jurors that they could maintain their objectivity, we have held that refusal to grant a mistrial rests on solid footing. *Clayton* v. *State*, 321 Ark. 602, 906 S.W.2d 290 (1995). Thus, the trial court did not abuse its discretion in refusing to grant a mistrial.

█ The trial court did commit error in initially discussing the matters with the foreman and the juror out of the presence of counsel, but the trial court subsequently notified counsel that the discussions had taken place, and then had counsel present when the jurors were questioned. Thus, there was no prejudice.

Baldwin next contends that the trial court erred in granting an *ex parte* continuance to the State. The argument is based on the following facts. During Baldwin's defense, the prosecutor informed the trial court that he found a necklace that Echols was wearing when arrested, noticed some red spots on it, and sent it to the crime laboratory for testing, which confirmed that the spots were blood. After the State's rebuttal, the prosecutor stated that he wanted to reserve the right to reopen the next day if the testing was complete. The court reconvened two days later, on a Thursday, and the

prosecutor reported that the laboratory had found that one spot of blood was consistent with the blood of Echols, one was consistent with Baldwin, and one was consistent with Steve Branch. The prosecution asked to reopen the State's case, subject to appellants' ability to contact an expert witness. Appellant argued, among other things, that the break in the trial had been the result of an *ex parte* continuance between the prosecutor and the trial court.

The court asked Baldwin what remedy he wanted, and if he wanted a mistrial. Baldwin said he would decide after the jury was polled about how they got the information about the continuance and whether they knew of the reason for the continuance. After a break, the prosecutor stated to the court that the State understood that a mistrial would be granted as to Baldwin if the State persisted in the necklace evidence; therefore, the State did not want to reopen the case.

Baldwin's counsel informed the trial court that it would be fine to poll the jury at large. When asked if any of them had learned the reason the continuance was necessary, they answered, "No." The trial court also inquired as to whether the jury had gained any information from any outside source and whether they had followed the court's instructions. The jurors responded that they had followed the court's instructions.

Baldwin's argument on appeal is that the trial court should have denied the continuance because the prosecutor did not file an affidavit as required by Ark. Code Ann. § 16-63-402(a). This argument was not made to the trial court, and we will not consider it for the first time on appeal. Moreover, the record indicates that Baldwin got the relief he requested, polling the jury, and that, in any event, he did not suffer prejudice because the necklace and the evidence about the blood was not put before the jury. *See Dumond v. State*, 290 Ark. 595, 721 S.W.2d 663 (1986); *Goldsmith v. State*, 301 Ark. 107, 782 S.W.2d 361 (1990).

Baldwin next argues that the State of Arkansas, through the office of the prosecuting attorney, was guilty of such misconduct that it necessitates reversal of the convictions and new trials. He contends that the office of prosecuting attorney was guilty of the following: (1) abuse of subpoena power; (2) failure to disclose Dr. Duke Jennings as a witness; (3) failure to disclose the search of Echols's personal effects while in jail and failure to notify appellants

that it would introduce evidence of Echols's "doodling" Baldwin's name; (4) conducting *ex parte* communications regarding a continuance; (5) conducting a demonstration with a knife cutting a grapefruit during closing. This opinion has already discussed each of the allegations and held they were without merit excepting the alleged abuse of the prosecutor's subpoena powers. Accordingly, in discussing this point of appeal, we discuss only the alleged abuse of subpoena powers.

Baldwin contends that the prosecutor used his subpoena power in violation of the authority granted by Ark. Code Ann. § 16-43-212 (Repl. 1994). The prosecutor's subpoena power granted under the statute was passed by the General Assembly to implement the power of prosecutors to bring criminal charges by information. *Cook* v. *State*, 274 Ark. 244, 623 S.W.2d 820 (1981). It was designed to take the place of questioning by a grand jury. *Kaylor* v. *Fields*, 661 F.2d 1177 (8th Cir. 1981). The emergency clause to the statute states that it was enacted to enable prosecutors to "properly prepare criminal cases." *Cook* v. *State*, 274 Ark. at 248, 623 S.W.2d at 822. The prosecutor may use the subpoena power to investigate and prepare for trial as long as the power is not abused. *Todd* v. *State*, 283 Ark. 492, 678 S.W.2d 345 (1984). However, we will reverse a case in which a prosecutor abuses the subpoena power. *Foster* v. *State*, 285 Ark. 363, 687 S.W.2d 829 (1985); *Cook* v. *State*, 274 Ark. at 249, 623 S.W.2d at 823. Baldwin has made no showing of abuse. All he proved is that the prosecutor subpoenaed three witnesses, who did not testify at trial, and subpoenaed his school records. The trial court found that the subpoenas were for investigation and preparation and did not amount to an abuse of the power. The finding was not in error.

On March 29, 1994, Baldwin filed a motion for new trial "pursuant to Rule 59 of the Arkansas Rules of Civil Procedure." In addition, Baldwin filed a motion requesting Judge Burnett to disqualify so that "an impartial court could determine whether or not the prosecution was guilty of misconduct in said ex parte conversation." Judge Burnett issued an order on April 22, 1994, denying the hearing, the motion for recusal, and the motion for mistrial. On appeal, Baldwin argues that he should have been granted a hearing pursuant to Ark. R. Crim. P. 36.22 and that Judge Burnett should have recused because the matter involved factual disputes regarding his conduct.

Baldwin's motion stated that it was filed pursuant to "Rule 59 of the Arkansas Rules of Civil Procedure." He advances his argument that the trial court was required to hold a hearing under Ark. R. Crim. P. 36.22 for the first time on appeal, and a party cannot raise an argument for the first time on appeal. Even had it been argued, he would not be entitled to a new trial solely because he did not get a hearing. *Turner* v. *State*, 325 Ark. 237, 926 S.W.2d 843 (1996). Similarly, the disqualification motion is without merit. The decision to disqualify is within the trial court's discretion, and we will not reverse the exercise of that discretion without a showing of abuse. An abuse of discretion can be shown by proving bias or prejudice. *Id.* Baldwin has shown neither bias nor prejudice.

In accordance with Rule 4-3(h) of the Rules of the Supreme Court, the record has been reviewed for rulings adverse to both appellants, but not argued on appeal, and no reversible errors were found.

Affirmed.